237 P.3d 1067

**Paulette Ka'anohiokalani KALEIKINI, Petitioner/Appellant–Appellant,**

v.

**Laura H. THIELEN,[1] in her official capacity as Chairperson of the Board of Land and Natural Resources, Board of Land and Natural Resources, and the Department of Land and Natural Resources, Respondent/Appellees–Appellees.**

No. 28491.

Supreme Court of Hawai'i.

Aug. 18, 2010.

---

1. During the pendency of this action, Laura H. Thielen succeeded Peter Young as chairperson of the Board of Land Natural Resources (BLNR). Thus, pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1) (2009), Thielen has been substituted automatically for Young in this case.

**4**

David Kimo Frankel (Moses K.N. Haia, III, with him on the application, of Native Hawaiian Legal corporation), for petitioner/appellant-appellant.

Linda L.W. Chow, Deputy Attorney General, for respondent/appellee-appellee.

MOON, C.J., NAKAYAMA, and DUFFY, JJ.; ACOBA, J., and RECKTENWALD, J., concurring separately.

Opinion of the Court by MOON, C.J.

On November 4, 2009, this court accepted a timely application for a writ of certiorari filed by petitioner/ appellant-appellant Paulette Ka'anohiokalani Kaleikini on September 28, 2009, requesting that this court review the Intermediate Court of Appeals' (ICA) July 9, 2009 order dismissing as moot the appeal from the Circuit Court of the First Circuit's [2] March 16, 2007 order and April 4, 2007 final judgment. Therein, the circuit court dismissed Kaleikini's notice of agency appeal on the basis that it lacked subject matter jurisdiction. Oral argument was held on December 17, 2009.

Briefly stated, the O'ahu Island Burial Council (OIBC) approved a burial treatment plan submitted by developer General Growth Properties (GGP), involving the disinterment of Native Hawaiian burial remains or "iwi" discovered at GGP's project site at the Ward Village Shops. Thereafter, Kaleikini, pursuant to Hawai'i Revised Statutes (HRS) § 6E–43 (1993), quoted *infra*, requested a contested case hearing, which was denied by respondents/appellees-appellees Peter Young, in his official capacity as Chairperson of the BLNR,[3] the BLNR, and the Department of Land and Natural Resources (DLNR) [hereinafter, collectively, DLNR]. Kaleikini then sought judicial review of DLNR's denial; however, the circuit court dismissed, *sua sponte*, her agency appeal and an accompanying motion for stay, ruling that it lacked subject matter jurisdiction. Although the circuit court recognized that Kaleikini was seeking review of DLNR's denial of her request for a contested case hearing, it seemingly felt constrained by existing case

---

**2.** The Honorable Eden E. Hifo presided.

**3.** *See supra* note 1.

law to rule that it lacked jurisdiction under HRS chapter 91 because no agency contested case had occurred. Kaleikini appealed, and the ICA, thereafter, dismissed her appeal as moot, reasoning that "the remedy sought by Kaleikini—[i.e.,] a determination that the circuit court had jurisdiction to review the denial of Kaleikini's request for a contested-case hearing—[was] no longer necessary[.]" ICA's Order at 3.

On application, Kaleikini essentially argues that the ICA erred in dismissing her appeal as moot. As discussed more fully *infra*, we agree with the ICA that Kaleikini's direct appeal was moot; however, unlike the ICA, we hold that Kaleikini's appeal falls within the public interest exception to the mootness doctrine. Additionally, in addressing the merits of Kaleikini's appeal, we hold that the circuit court erred in dismissing Kaleikini's agency appeal for a lack of subject matter jurisdiction because Kaleikini met the requirements of HRS § 91–14 (1993 and Supp. 2008), quoted infra. Accordingly, we vacate the ICA's order dismissing Kaleikini's appeal for mootness and remand the case to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

■ To understand the context of the instant appeal, including the ICA's reasoning, we took judicial notice of a separate, but closely related appeal, i.e., *Kaleikini v. Thielen*, No. 29675. *See State v. Kotis*, 91 Hawai'i 319, 341 n. 25, 984 P.2d 78, 100 n. 25 (1999) (stating that "an appellate court may, in its discretion, take judicial notice of files or records of a case on appeal") (citations and original brackets omitted). We recognize, however, that, although "a [c]ourt may take judicial notice of each document in the [c]ourt's file, *it may . . . take judicial notice of [only ] the truth of facts asserted in documents[,] such as orders, judgments[,] and findings of fact [ (FOFs ) ] and conclusions of law [ (COLs ) ] because of the principles of collateral estoppel, res judicata, and the law of the case.*" *Id.* at 342, 984 P.2d at 101 (emphasis added) (format altered) (original brackets omitted). Thus, for purposes of this opinion, the factual and procedural background presented below has been drawn from the record on appeal in the instant case (i.e., Civ. No. 07–1–0068) and, to the extent allowed by this court's holding in *Kotis*, emphasized above, the record on appeal in the related case (i.e., Civ. No. 07–1–0067).

### A. *Factual and Procedural Background*

On September 13, 2006, a public hearing was held before the OIBC, pursuant to HRS chapter 92 (governing public agency meetings and records) and Hawai'i Administrative Regulations (HAR) § 13–300–33 (2009),[4] on a proposed burial treatment plan submitted to OIBC by GGP, seeking permission to remove iwi discovered by GGP at the Ward Village Shops project area. According to the minutes of the meeting, GGP indicated that it was seeking "to relocate the iwi into an area where they would be safe" and that "the construction plans for the project [did] not allow for a lot of redesign." Kaleikini, who was present at the meeting, is a recognized "cultural descendant" to the iwi found at the Ward Village Shops project.[5] Kaleikini

4. HAR § 13–300–33 states in relevant part that:
 (a) The council shall have jurisdiction over all requests to preserve or relocate previously identified Native Hawaiian burial sites.
 (b) The applicant shall submit a request to preserve in place or relocate a Native Hawaiian burial site to [DLNR] in the form of a burial treatment plan. . . .
 (c) The applicant shall consult with [DLNR] in the development of the burial treatment plan. Once approved by [DLNR], the applicant shall submit requisite copies of the completed burial treatment plan for distribution to the council, accompanied by a simple written request to be placed on the council agenda for a determination of burial site treatment.
 . . . .

 (f) The council shall render a determination to preserve in place or relocate previously identified Native Hawaiian burial sites in accordance with section 13–300–38 within forty-five days of referral by [DLNR], unless otherwise extended by agreement between the landowner and [DLNR].

5. The HAR recognizes two types of "descendants"—cultural and lineal. Under HAR § 13–300–2 (2009), "cultural descendant" means, "with respect to non Native Hawaiian skeletal remains, a claimant recognized by the [island burial] council after establishing genealogical connections to Native Hawaiian ancestors who once resided or are buried or both, in the same ahupua'a or district in which certain Native Ha-

maintained that, as a Native Hawaiian cultural practitioner, one of the critical tenets of Native Hawaiian traditional and customary practices is to ensure that iwi remain undisturbed and that they receive proper care and respect.

Kaleikini presented testimony against the proposed burial treatment plan at the OIBC meeting. More specifically, the meeting minutes indicate that Kaleikini asserted that GGP should have made a "better" attempt to redesign the project so that the iwi could be preserved in place. Ultimately, the OIBC

> waiian skeletal remains are located or originated from."
>
> Under the same rule, "lineal descendant" means,
>> with respect to Native Hawaiian skeletal remains, a claimant who has established to the satisfaction of the council, direct or collateral genealogical connections to certain Native Hawaiian skeletal remains, or with respect to non Native Hawaiian skeletal remains, a claimant who has established to the satisfaction of [DLNR], direct or collateral genealogical connections to certain non Native Hawaiian skeletal remains.

6. HRS § 6E–43 provides in relevant part that:

> (a) At any site, other than a known, maintained, actively used cemetery where human skeletal remains are discovered or are known to be buried and appear to be over fifty years old, *the remains and their associated burial goods shall not be moved without [DLNR]'s approval.*
>
> (b) All burial sites are significant and shall be preserved in place until compliance with this section is met, except as provided in section 6E–43.6. *The appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burial sites is warranted*, following criteria which shall include recognition that burial sites of high preservation value, such as areas with a concentration of skeletal remains, or prehistoric or historic burials associated with important individuals and events, or areas that are within a context of historic properties, or have known lineal descendants, shall receive greater consideration for preservation in place. The criteria shall be developed by [DLNR] in consultation with the councils, office of Hawaiian affairs, representatives of development and large property owner interests, and appropriate Hawaiian organizations, such as Hui Malama I Na Kupuna O Hawai'i Nei, through rules adopted pursuant to chapter 91. A council's determination shall be rendered within forty-five days of referral by [DLNR] unless otherwise extended by

approved the burial treatment plan by a vote of 6–3 with one "kānalua" (an undecided vote or a vote to abstain).

On October 12, 2006, Kaleikini sent a letter to DLNR, requesting that a contested case hearing be held, pursuant to HRS chapter 91, to review the OIBC's September 13, 2006 decision to relocate the iwi at the Ward Village Shops Project. Therein, Kaleikini alleged that she was entitled to a contested case hearing pursuant to, *inter alia*, HRS § 6E–43 [6] and HAR §§ 13–300–51 (2009) [7] and 13–300–52 (2009).[8] Additionally, Kaleiki-

> agreement between the landowner and [DLNR].
>
> (c) *Council determinations may be administratively appealed to a panel composed of three council chairpersons and three members from [BLNR] as a contested case pursuant to chapter 91.* In addition to the six members, the chairperson of [BLNR] shall preside over the contested case and vote only in the event of a tie.
> (Emphases added.) We note that there are five burial councils statewide, each of which has a chairperson. *See* HAR §§ 13–300–21 and –24.

7. HAR § 13–300–51 provides that:

> *Appeal of council determination.* (a) **When required by law, the appeals panel shall hold a contested case hearing upon timely written petition of any person who is aggrieved by a council determination to preserve in place or relocate Native Hawaiian skeletal remains and any burial goods** from a previously identified burial site and who is properly admitted as a party pursuant to section 13–300–54.
>
> (b) Unless specifically prescribed in this chapter or by chapter 91, HRS, the appeals panel may adopt procedures that in its opinion will best serve the purposes of the hearing.
> (Underscored emphasis in original.) (Bold emphasis added.)

8. HAR § 13–300–52 states:

> *Request for hearing.* (a) A written petition for a contested case hearing shall be filed, *i.e.* mailed and postmarked, **within forty five days** following receipt of written notification of the council determination except that where a request for reconsideration of a council determination is made, the forty five day period to file a petition shall commence following action by the council to either deny the request for reconsideration or reaffirm its original decision following reconsideration.
>
> (b) **A petition** requesting a contested case hearing **shall contain concise statements of:**
> (1) The legal authority by which appeal is requested;
> (2) The council determination being appealed and the date of the determination;

ni stated that the [OIBC]'s determination adversely affected her because she was "a recognized cultural descendant ... and a possible lineal descendant to the previously identified [iwi] at the Ward Village [Shops] project site" and that the OIBC did not (1) "consult with [Kaleikini] and 'ohana (recognized descendants), as [required pursuant to HAR § 13–300–36 (2009) (governing the criteria for evaluating requests to preserve or relocate Native Hawaiian burial sites)]" and (2) "adequately evaluate, consider[,] and apply the criteria set forth in HAR [§ ]13–300–36[.]" Kaleikini also asserted that she "believe[d] that certain [OIBC] members [did] not meet the criteria required to become a member of the [OIBC] as listed in HAR [§ ]13–300–22(b)(2) [ (2009) (requiring that Council members "[p]ossess an understanding of Hawaiian culture, history, customs, practices, and[,] in particular, beliefs and practices relating to the care and protection of Native Hawaiian burial sites and ancestral remains and burial goods") ] and [that] their decision to relocate was based on their inadequate cultural understanding of the care and protection of ancestral burials." Finally, Kaleikini contended that she was entitled to a contested case hearing because her "constitutional rights as a native Hawaiian"—specifically, those rights contained in article XII, section 7 of the Hawai'i Constitution [9] were "adversely affected by the relocation of [the iwi]."

On December 12, 2006, DLNR denied Kaleikini's request for a contested case hearing via letter, stating that:

The law permits an aggrieved person to administratively appeal burial council determinations. A request for a contested

> (3) The nature of the interest that may be adversely affected by the council determination;
> (4) The relevant facts and issues raised;
> (5) The relief being sought; and
> (6) Any other information deemed applicable.
> (Underscored emphasis in original.) (Bold emphases added.)

9. Article XII, § 7 of the Hawai'i Constitution provides that:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are

case will be approved when valid grounds for such requests are present. The reasons underlying your appeal of OIBC's prior determinations are neither factually nor legally sufficient to warrant a contested case proceeding. Accordingly, your request for a contested case is denied.

On January 10, 2007, Kaleikini filed a notice of agency appeal with the circuit court, seeking review of DLNR's December 12, 2006 denial of her request for a contested case hearing [hereinafter, the agency appeal case]. On the same day, Kaleikini filed a separate complaint in Civ. No. 07–1–0067–01, the previously mentioned related case, seeking declaratory relief and an injunction to prevent the imminent removal of the iwi from the Ward Village Shops project area [hereinafter, the dec action]. In her six-count complaint, brought against GGP, Young, BLNR, and DLNR, Kaleikini sought, inter alia, (1) a declaration that DLNR's denial of Kaleikini's request for a contested case hearing was without basis and invalid and (2) an order requiring that a contested case hearing be held.

**1. Agency Appeal Case**

On February 21, 2007, Kaleikini filed a motion for a stay in the agency appeal, seeking to prevent DLNR from granting final approval of GGP's "[b]urial [t]reatment [p]lan, which would allow the immediate disinterment of human remains discovered on the project site, until a decision on the merits of [the] agency appeal [was] issued by [the circuit court]." [10] A hearing was held on Kaleikini's motion for a stay on February 22, 2007. At the outset of the hearing, the circuit court stated that:

> descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

10. Pursuant to HAR § 13–300–38(f) (2009), "[w]here a council determination to relocate is accepted as final, the applicant shall develop the burial site component of the archaeological data recovery plan ... and any accepted recommendations relating to burial site treatment. Within ninety days of the council determination, [DLNR] shall approve the plan following consultation with the applicant, any known lineal descendants, the appropriate council, and any appropriate Hawaiian organizations."

I do know and appreciate from [Kaleikini] ... that you have filed a [dec action], which I think is the only way now that you can actually get judicial review of the relief.

Because, as I have read *Aha Hui Malama o Kaniakapupu v. Land Use Commission*, 111 Hawai'i 124[, 139 P.3d 712 (2006) [hereinafter, *Kaniakapupu,*]] ... affirming [the circuit c]ourt's decision that [it] lack[ed] subject matter jurisdiction because there was no contested case hearing decision appealed from, it's clear that while you're appealing the decision not to give a contested case, obviously there hasn't been one.

Now, I actually remember [Kaleikini's attorney] being here on a different case where it was, if I'm not mistaken, the same situation. And he was very articulate in suggesting that it's a major Catch 22, because if you're denied a contested case hearing, and the denial can't be appealed, then there is no way to get judicial review of that. And any agency could improperly deny a contested case hearing.

Well, the Supreme Court didn't actually answer that in ... *Kaniakapupu*. But the majority said ... ["]if the [c]ircuit [c]ourt has no jurisdiction to determine if an appellant were [sic] entitled to a contested case hearing after having requested one, any agency could arbitrarily and capriciously deny anyone a hearing at any time, regardless of whether such hearing were required by law, and the aggrieved party could never obtain judicial review of such denial. . . .["]

However, in [*Kaniakapupu*], the Hui did not request a contested case hering [sic]. Indeed, the Hui concede[d] that ... ["]there is no procedural vehicle for any party or interested person to obtain a contested case hearing on whether a petition-er has failed to perform according to the conditions imposed, or failed to perform according to representations or commitments she made. . . .["]

... So [the circuit court], while not sure about it, because they didn't actually answer the question, believe[s] that the filing of the [dec action], assigned to Judge Lee, is the proper vehicle. That [the circuit court] doesn't have jurisdiction, because there wasn't a contested case hearing.[11]

Accordingly, the circuit court dismissed Kaleikini's agency appeal case. Additionally, the circuit court ruled that, inasmuch as it did not have jurisdiction to hear the agency appeal, Kaleikini's motion for a stay was rendered moot. However, recognizing the pending dec action, the circuit court *sua sponte* re-filed Kaleikini's motion for a stay in that case. An order dismissing Kaleikini's agency appeal for lack of subject matter jurisdiction, consistent with the circuit court's oral ruling, was entered on March 16, 2007. On April 4, 2007, the circuit court entered its final judgment. On April 9, 2007, Kaleikini filed a timely notice of appeal in the case at bar from the circuit court's March 16, 2007 order and April 4, 2007 final judgment.

### 2. Dec Action

As indicated above, Kaleikini's motion for a stay was re-filed on February 22, 2007 in the dec action and sought to prevent DLNR and its chairperson from approving GGP's "[b]urial [t]reatment [p]lan, which would allow the immediate disinterment of human remains discovered on the project site, until a decision on the merits of [the] agency appeal [was] issued by [the circuit court]." A hearing was held on Kaleikini's motion for a stay on February 23, 2007,[12] but no transcript of the proceeding was provided in the record on appeal for the dec action. On March 28,

---

11. The circuit court additionally stated:

> Well, I may be wrong. But I would ask you folks to read what I believe is the current and most recent decision. I read the part that I thought was the most pertinent as to that. And it does leave an opening because in this case they ruled that in order to get a contested case hearing you have to put that in writing, which [Kaleikini's attorneys] did, I'm understanding.

> . . . .

> And frankly, it wouldn't hurt my feelings ... if [Kaleikini's attorney] for purpose of knowing the future takes it up, because this is a question the [s]upreme [c]ourt did not answer.

12. The Honorable Randall K.O. Lee presided over Kaleikini's motion for a stay.

2007, an order denying Kaleikini's motion for a stay was entered.

On February 28, 2007, Kaleikini filed a motion for a preliminary injunction, seeking again to prevent DLNR from approving GGP's burial treatment plan and to prohibit GGP from "disinterring numerous graves and relocating ancient Hawaiian human skeletal remains (iwi) located there." Both DLNR and GGP opposed the motion. After a hearing on October 24, 25, and 26, 2007, the circuit court,[13] on November 27, 2007, filed an order denying Kaleikini's motion for a preliminary injunction.

On August 21, 2007, Kaleikini filed a motion for summary judgment, arguing, *inter alia*, that DLNR failed to hold a contested case hearing as required by law. Both DLNR and GGP opposed Kaleikini's motion for summary judgment. A hearing was apparently held on Kaleikini's motion on September 27, 2007; however, no transcript of the hearing was included in the record on appeal in the dec action. On October 12, 2007, the circuit court denied Kaleikini's motion for summary judgment.

On October 29, 2007, Kaleikini—with permission of the circuit court—filed a seven-count second amended complaint in the dec action.[14] Therein, Kaleikini alleged that she was entitled to declaratory and injunctive relief because: (1) DLNR's denial of Kaleikini's request for a contested case hearing was without basis and invalid (count 1); (2) "[t]he disinterment of Native Hawaiian burials in this instance would adversely affect [Kaleikini]'s Native Hawaiian rights and would violate Art. XII § 7 of the Hawai'i State Constitution" (count 2); (3) the OIBC's "failure to investigate alternatives and require the developer to explore alternatives [was] a breach of its public trust responsibilities" (count 3); (4) the OIBC's decision to remove the burials violated Kaleikini's fundamental rights because "[p]rotection of burials is a fundamental right that all citizens enjoy" and that the OIBC's decision "was not narrowly tailored given its failure to consider alternatives" (count 4); (5) the disinterment of iwi "in this

instance [would] violate HRS § 6E–43 and HAR § 13–300–36" (count 5); (6) the proposal to remove iwi would irreparably injure the iwi and relief was needed pursuant to HRS § 6E–13 (1993) (governing enforcement of chapter 6E, which relates to historic preservation) (count 6); and (7) DLNR failed to consult with Kaleikini and others "prior to authorizing the removal of many of the inadvertently discovered burial remains as required by law" or to "properly consider the criteria provided in HAR § 13–300–36 prior to authorizing the removal of many of the inadvertently discovered burial remains" (count 7).

On January 30, 2008, DLNR filed a motion for summary judgment, arguing that judgment should be entered in its favor as to all of Kaleikini's claims because, "as a matter of law, [Kaleikini could not] prevail on the merits of her claims against [DLNR]." On February 11, 2008, GGP filed a substantive joinder in DLNR's motion for summary judgment. Kaleikini opposed DLNR's motion, and, on March 4, 2008, a hearing was held regarding, *inter alia*, DLNR's motion for summary judgment. At the close of the hearing, the circuit court orally granted DLNR's motion for summary judgment and GGP's joinder as to count 1 (denial of contested case hearing), count 2 (violation of Hawai'i constitution article XII, section 7), count 3 (breach of public trust), and count 4 (violation of fundamental rights), reasoning that there were no genuine issues of material fact as to those counts inasmuch as DLNR "was within [its] discretion to decide whether there was a legal basis for a contested case hearing" and that Kaleikini's constitutional claims were not supported by Hawai'i's case law. With regard to count 5 (violation of HRS § 6E–43, HAR § 13–30–36), count 6 (irreparable injury to iwi), and count 7 (improper decision-making authorizing the removal of many inadvertent discoveries), the court found that issues of material fact existed and, thus, denied DLNR's motion for summary judgment and GGP's joinder as to those counts. A written order

---

**13.** The Honorable Glenn J. Kim presided over the remainder of the dec action.

**14.** Kaleikini—with permission of the court—had filed a first amended complaint on May 2, 2007.

confirming the circuit court's oral ruling was filed on March 19, 2008.

On June 10, 2008, the parties filed a stipulation to dismiss all of the remaining claims in the second amended complaint (*i.e.*, counts 5, 6, and 7) with prejudice, pursuant to a settlement agreement, which the circuit court approved. Thereafter, the circuit court entered a judgment in favor of DLNR, but for reasons that are not relevant to the issues before this court, subsequently entered a first and second amended judgment in the dec action on February 9 and February 27, 2009, respectively. Kaleikini filed a timely notice of appeal from the circuit court's first and second amended judgments on March 3, 2009 in appeal No. 29675.[15]

### B. Appeal of the Instant Agency Appeal Case Before the ICA

Relying primarily on *Public Access Shoreline Hawai'i v. Hawai'i County Planning Commission* [hereinafter, *PASH*], 79 Hawai'i 425, 903 P.2d 1246 (1995), Kaleikini argued before the ICA that the circuit court erred in dismissing *sua sponte* her agency appeal for lack of jurisdiction. She maintained that the circuit court had subject matter jurisdiction, pursuant to HRS chapter 91. In response, DLNR contended that HRS chapter 91—specifically, HRS § 91–14 (1993 and Supp. 2008)[16]—did not confer jurisdiction on the circuit court to review DLNR's denial of Kaleikini's request for a contested case hearing because Kaleikini did "not participate in a contested case."

On June 2, 2009, the ICA issued an order requesting supplemental memoranda, stating specifically:

> Inasmuch as Kaleikini, in filing the separate proceeding in [the dec action] may have already obtained the remedy she seeks in this appeal—judicial review of [DLNR]'s allegedly wrongful denial of her request for a contested-case hearing and a stay of decisionmaking [sic] on the burial-treatment plan for the project—this appeal may be moot.
>
> To assist this court in determining whether an actual controversy continues to exist in this case [ (*i.e.*, the agency appeal case) ], Kaleikini and [DLNR] are hereby directed to file supplemental memoranda not to exceed five pages, no later than ten calendar days from the filing of this order, discussing the following issues:
>
> (1) The status of [the dec action] and whether any orders, decisions, or judgments have been rendered [therein] that affect this appeal and any remedial relief sought by Kaleikini in [the agency appeal case];
>
> (2) Whether the burial-treatment plan for the project has been implemented; and
>
> (3) Why this appeal is not moot.

On June 12, 2009, Kaleikini filed her supplemental memorandum, indicating that, although she had filed a notice of appeal from the circuit court's February 9 and February 27, 2009 amended judgments in the dec action, the proceedings were stayed due to GGP's notice of filing of bankruptcy. Thus, Kaleikini contended that she had "*not re-*

---

**15.** The supreme court record in appeal No. 29675 reveals that this appeal is currently stayed due to GPP's notice of filing of bankruptcy, filed on May 8, 2009.

**16.** HRS § 91–14 provides in relevant part that:

(a) *Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter;* but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of

this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

(b) Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency, pursuant to rule of court, except where a statute provides for a direct appeal to the intermediate appellate court, subject to chapter 602 . . . . The court in its discretion may permit other interested persons to intervene.
(Emphasis added.)

ceived the relief she requested in [the agency appeal] from [the dec action]." (Emphasis in original.) With regard to whether the burial treatment plan had been implemented, Kaleikini stated it was her "understanding that all the terms of the current burial treatment plan [had] *not* been fully implemented." (Emphasis in original.) Additionally, Kaleikini acknowledged that the parties had entered into a settlement agreement in the dec action with respect to counts 5–7 of her second amended complaint, but indicated that the settlement agreement "did *not* settle [c]ounts 1–4, which include[d] the [c]ount regarding the denial of the contested case hearing" and, in fact, Kaleikini stated that "[t]he settlement explicitly acknowledged [Kaleikini]'s right to appeal [c]ounts 1–4 ... [and, thus, t]he settlement did not affect [Kaleikini]'s rights in this appeal." (Emphasis in original.) Lastly, Kaleikini asserted that, "[e]ven if the [ICA] were to interpret the settlement agreement so broadly as to resolve the issue of the contested case and burial treatment plan, exceptions to the mootness doctrine clearly apply"; specifically, the public interest and the capable of repetition yet evading review exceptions.

Conversely, DLNR—in its supplemental memorandum filed on June 15, 2009—asserted that the mootness doctrine would be properly invoked in the case at bar because (1) "[the dec action] substantively disposed of the issue on appeal in [the agency appeal case]" and (2) "the terms of the [s]ettlement [a]greement provided that all of the previous-

ly identified burials ... would be reinterred either in a [c]entral [b]urial [p]reservation [s]ite or in a specific reburial site for specified remains." [17] In DLNR's view, Kaleikini's appeal was moot because "the parties [had] ... agreed to the relocation and reinterment of the burials, which *ha[d] already occurred*," and, thus, "there [was] no basis for contesting the decision of the OIBC to relocate the burials and there [was] no effective remedy which this court could order in this case." (Emphasis added.)

On July 9, 2009, the ICA issued an order dismissing Kaleikini's appeal as moot. Therein, the ICA stated, *inter alia,* that:

Based on our review of the record in this appeal, this court's "Order Requesting Supplemental Memoranda" filed on June 2, 2009, Kaleikini's supplemental memorandum filed on June 12, 2009, and [DLNR's] supplemental memorandum filed on June 15, 2009, it appears that ..., Kaleikini filed a [dec. action] which, among other claims, challenged (1) the denial of her request for a contested-case hearing, and (2) the [OIBC]'s approval for disinterment and relocation of the historic remains. In [the dec action], the circuit court dismissed Kaleikini's claim for wrongful denial of her request for a contested-case hearing via summary judgment. Her remaining claims were dismissed by summary judgment or stipulation of the parties. Subsequently, the parties entered into a settle-

---

17. The settlement agreement, which was attached as "Exhibit A" to DLNR's supplemental memorandum, provided in relevant part that Kaleikini "expre'sed her support and agreement with the April 9, 2008[] OIBC recommendation in favor of the Addendum to the Burial Treatment Plan," discussed below. Additionally, the agreement stated:

The disinterment of Native Hawaiian remains is wholly inconsistent with [Kaleikini]'s cultural beliefs and Kaleikini opposes the disinterment of any burials on the property on that basis. Kaleikini agrees, however, that the Central Burial Preservation Site shall be used for the reinterment of the subject and all other burial remains which may be encountered on the [p]roperty, and for which disinterment and relocation have been properly authorized. [Kaleikini] hereby confirms her support of such use of the Central Burial Preservation Site and agrees that she shall not seek to

prevent the use of the Central Burial Site in any administrative or judicial proceedings or actions, or otherwise.

Also attached as "Exhibit A" to DLNR's supplemental memorandum was a copy of what was purported to be a draft of the addendum to the burial treatment plan to the Ward Village Shops project. The addendum indicates that, between March and October 2007, fifty-four more iwi were inadvertently discovered in the project area during "the excavation associated with the disinterment of the [eleven] previously identified [iwi], during excavation related to project construction, and during subsequent ... authorized exploratory excavation." The addendum proposes that (1) thirty-one of the inadvertently discovered iwi would be preserved in place and (2) the remaining iwi would be disinterred, stored, and then reinterred in, among other places, a central burial site.

ment agreement, general release, and waiver of claims (settlement agreement). Pursuant to the settlement agreement, the parties agreed to a revised burial plan that addressed the inadvertently discovered and future discoveries of historic remains. *The revised burial plan has been implemented.*

Inasmuch as the remedy sought by Kaleikini—a determination that the circuit court had jurisdiction to review the denial of Kaleikini's request for a contested-case hearing—is no longer necessary, this appeal is moot. *See Carl Corp. v. State, Dep't of Educ.*, 93 Hawai'i 155, 164, 997 P.2d 567, 576 (2000) (holding that invocation of the mootness doctrine is proper "where 'events have so affected the relations between the parties that the two conditions [for] justiciability relevant on appeal—adverse interest and effective remedy—have been compromised' "). (Ellipsis omitted.) [18]

(Emphasis added.) (Footnote omitted.) Thereafter, this court accepted Kaleikini's application on November 4, 2009 and heard oral argument on December 17, 2009.

## II. *STANDARD OF REVIEW*

"It is axiomatic that mootness is an issue of subject matter jurisdiction. Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo.*" *Hamilton v. Lethem,* 119 Hawai'i 1, 4–5, 193 P.3d 839, 842–43 (2008) (citations and internal quotation marks omitted).

## III. *DISCUSSION*

As previously indicated, Kaleikini argues that the ICA erred when it concluded that Kaleikini's appeal was moot and did not address whether it fell within any exceptions to the mootness doctrine. More specifically, Kaleikini contends that "[t]he ICA erred in its decision because (1) the case is not moot; (2) this case falls squarely within the 'public interest' exception to the mootness doctrine; and (3) this case would also fall within the 'capable of repetition yet evading review' ex-

ception to the mootness doctrine." Additionally, Kaleikini raises the following questions: (1) "[w]hat procedure should be used to challenge an agency's denial of a request for a contested case hearing"; (2) "[d]oes a recognized cultural descendent to Native Hawaiian burial remains (iwi), who engages in traditional and customary practices with respect to those remains, have the right to a contested case hearing on a decision to remove iwi"; and (3) "[h]ow can a Native Hawaiian and a cultural descendent of iwi obtain timely judicial review of an administrative decision to remove iwi?" (Emphasis in original omitted.)

### A. *Mootness*

In her application, Kaleikini states:

The issues ... in this appeal are *not* moot.... Kaleikini asked that ... [DLNR]'s decision to deny her request for a contested case hearing be reversed; that the [circuit] court issue an order requiring a contested case hearing; that a decision on the burial treatment plan be stayed; that she be awarded attorney's fees and costs; and that the [circuit] court provide such other relief as is just and proper.

(Emphasis in original.) However, during oral argument, Kaleikini conceded that "the denial of [her request for a contested case hearing] essentially mooted her claim because of the passage of time." As a result, Kaleikini focused her argument before this court on the exceptions to the mootness doctrine, *i.e.*, public interest and capable of repetition yet evading review. Based on Kaleikini's concession, we hold that the instant appeal is moot and turn to examine whether Kaleikini's appeal falls within any of the exceptions to the mootness doctrine.

### B. *Public Interest Exception to the Mootness Doctrine*

Kaleikini argues that the public interest exception applies here because the question presented in this case involves "two important issues": (1) the rights of Native

18. Although Kaleikini maintained on appeal that "exceptions to the mootness doctrine clearly ap-

ply," the ICA apparently failed to address them.

Hawaiians; and (2) access to the courts. This court has stated that, "[w]hen analyzing the public interest exception, [it] look[s] to (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question." *Hamilton,* 119 Hawai'i at 6–7, 193 P.3d at 844–45 (citation omitted) (some brackets in original). This court recently examined the public interest exception in *Hamilton* and stated that:

> [T]he cases in this jurisdiction that have applied the public interest exception have focused largely on political or legislative issues that affect a significant number of Hawai'i residents. For example, in *Doe [v. Doe,* 116 Hawai'i 323, 172 P.3d 1067 (2007) ], we held that the public interest exception applied because it was "in the public's interest for this court to review the family court's ruling that Hawaii's grandparent visitation statute [was] unconstitutional on its face." *Id.* at 327, 172 P.3d at 1071. Additionally, in *Kaho'ohano-hano v. State,* 114 Hawai'i 302, 162 P.3d 696 (2007), this court held that the subject appeal was of a public nature because the outcome would affect all state and county employees. *Id.* at 333, 162 P.3d at 727. Likewise, in *Right to Know Committee v. City & County of Honolulu,* 117 Hawai'i 1, 175 P.3d 111 (App.2007), the ICA held that the question presented was of a public nature because the issue whether the City council must conduct its business in full view of the public and in compliance with the Sunshine Law was more public in nature than private. *Id.* at 9, 175 P.3d at 119.

*Id.* at 7, 193 P.3d at 845.

■ As indicated by Kaleikini, the issue presented here—the availability of judicial review of decision relating to the removal of Native Hawaiian burial sites—is of great public importance. In amending chapter 6E to include, *inter alia,* the relevant sections pertaining to Native Hawaiian burial sites,

the legislature specifically recognized that "[a]ll human skeletal remains and burial sites within the State are entitled to equal protection under the law regardless of race, religion, or cultural origin. *The public has a vital interest in the proper disposition of the bodies of its deceased persons, which is in the nature of a sacred trust for the benefit of all* [.] 1990 Haw. Sess. Laws Act 306, § 1 at 956 (emphasis added). The legislature further found that "native Hawaiian traditional prehistoric and unmarked burials are especially vulnerable and often not afforded the protection of law which assures dignity and freedom from unnecessary disturbance." *Id.* Such legislative pronouncements evince a recognition of the public importance of the issue presented here, *i.e.,* "the process of deciding to remove previously identified Native Hawaiian burial sites." Thus, the question presented here, like in *Right to Know,* is of a public nature.

■ Second, as reflected in the circuit court's statements (1) indicating confusion surrounding the issue whether an appellant may seek review of an agency's *denial* of a request for a contested case hearing and (2) suggesting the need for an authoritative answer from this court regarding the issue, it would seem desirable for this court to provide an authoritative determination providing future guidance for public officials. Lastly, with respect to the third prong, the likelihood of future recurrence of the question seems high inasmuch as it seems probable that iwi will continue to be unearthed at future construction projects. Accordingly, we conclude that the public interest exception applies to the case at bar.[19] We now turn to discuss the merits of Kaleikini's contentions on appeal.

### C. Merits of Kaleikini's Appeal

As quoted *supra,* Kaleikini presents three questions to this court for decision; however, all three questions center around the issue whether the circuit court erred in dismissing Kaleikini's agency appeal on jurisdictional grounds. As previously stated, the circuit

---

**19.** Inasmuch as we conclude that the public interest exception applies to the facts presented here, it is not necessary to address Kaleikini's arguments relating to the applicability of the capable of repetition yet evading review exception to the mootness doctrine.

court dismissed Kaleikini's agency appeal for lack of subject matter jurisdiction because Kaleikini did not participate in a contested case hearing. On application, Kaleikini contends that the circuit court, in so doing, erred because "[t]his court[ ] has, in three cases, stated that a chapter 91 appeal to the circuit court is the correct procedure to challenge an agency's denial of a request for a contested case hearing (if a right to a contested case exists and proper procedures are followed)." (Citing *Mortensen v. Board of Trustees of Emp. Ret. Syst.*, 52 Haw. 212, 473 P.2d 866 (1970), *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawaiʻi 64, 881 P.2d 1210 (1994), and *PASH* ).

■ "The right to appeal is purely statutory and exists only when jurisdiction is given by some constitutional or statutory provision." *Lingle v. Hawaiʻi Govʻt. Employees Ass'n*, 107 Hawaiʻi 178, 184, 111 P.3d 587, 593 (2005). HRS § 91–14 confers jurisdiction on the circuit court to review "final decision[s] and order[s] in [ ] contested case[s]." As previously quoted, HRS § 91–14 provides in relevant part that:

(a) *Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter;* but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

(Emphasis added.)

In dismissing the agency appeal, the circuit court relied exclusively on this court's decision in *Kaniakapupu.* Specifically, the circuit court stated:

Because, as I have read … *Kaniakapupu* … affirming [the circuit c]ourt's decision that [it] lack[ed] subject matter jurisdiction because there was no contested

case hearing decision appealed from, it's clear that while you're appealing the decision not to give a contested case, obviously there hasn't been one.

In other words, the circuit court determined that it did not have jurisdiction over Kaleikini's agency appeal, brought pursuant to HRS § 91–14, because she did not *participate* in a contested case hearing. On direct appeal, Kaleikini submitted that the circuit court erred in its interpretation of *Kaniakapupu* and extended the holding of that case "too far" inasmuch as *Kaniakapupu* merely stands for the proposition that the circuit court does "not have jurisdiction [where] no 'contested case' hearing [is] required by law." Kaleikini asserts that the circuit court should have, instead, looked at the framework set forth by this court in *PASH* to determine whether it had "jurisdiction to review the denial of a request for a contested case hearing." Inasmuch as the circuit court's ruling was based primarily on *Kaniakapupu,* we first address the applicability of that case to the facts presented here.

### 1. *Kaniakapupu*

In *Kaniakapupu,* landowners of a parcel of land petitioned the Land Use Commission (LUC) to amend the land use district boundary on the parcel of land from conservation district to urban district. 111 Hawaiʻi at 126, 139 P.3d at 714. The landowners indicated that they sought reclassification of the property to enable them to "subdivide the [p]roperty, construct both replacement and new houses on the [p]roperty, and make such other repair and improvements of the existing units in a manner ordinarily and customarily allowed for urban residential uses and thereby provide house lots or homes for their children." *Id.* A hearing was held before the LUC, and, thereafter, the LUC entered FOFs, COLS, and a decision and order, approving the reclassification. *Id.* In its FOFs, the LUC found that the landowners,

in order to provide reasonable assurance to the LUC that the proposed development is a family enterprise to provide housing for the family members and not a commercial enterprise for speculation, … represented that they [were] willing to be subjected to

a condition that members of the families ... would have a right of first refusal to purchase if any interest in the [p]roperty .were sought to be sold.

*Id.* (original brackets omitted). Thus, the LUC imposed a condition on the landowners that, should they desire to sell or convey ownership of all or portions of the property, "[they] shall first offer such interest to the other or in the alternative convey such interest to any of [their] children, as the case may be." *Id.* (original emphasis omitted).

Kaniakapupu—the historic ruins of the royal summer cottage of Kamehameha III—"is located on property owned by the State that shares a common boundary with, and is situated approximately 200 to 300 feet from, the [reclassified property]." *Id.* at 126–27, 139 P.3d at 714–15. Approximately eleven years after the LUC approved reclassification of the property, a "Hui [20] was formed in order to 'care for and serve as a steward of Kaniakapupu.'" *Id.* at 126, 139 P.3d at 714. Thereafter, the Hui "sought to have the LUC issue an order to show cause [ (OSC) ] as to why the classification of the [property] should not be reverted to conservation district," contending that one of the landowners had violated the condition imposed by the LUC inasmuch as she listed portions of the property for sale to the public. *Id.* at 127, 139 P.3d at 715. The Hui additionally requested that a hearing be held, pursuant to HAR § 15–15–70(c) (governing motions practice), on its motion for an OSC. *Id.* The LUC held a hearing on the Hui's motion for an OSC [hereinafter, motion hearing] and, thereafter, denied it on the basis that the Hui had not met its burden of demonstrating a failure to perform a condition, representation, or commitment on the part of the landowners. *Id.* at 128, 139 P.3d at 716.

The Hui filed a notice of appeal with the circuit court and, after briefing by the parties, the circuit court dismissed the Hui's appeal for a lack of subject matter jurisdiction. *Id.* at 129, 131, 139 P.3d at 717, 719. More specifically, the circuit court found that

the LUC did not hold a contested case hearing. ... If the motion for an [OSC] had been granted, then a contested case hearing would have been required.

. . . .

The [circuit] court concludes that the requirement in HRS § 91–14 that the order appealed from arise from a contested case hearing, has not been met. As such, this court lacks jurisdiction to reach the issue of whether a contested case hearing was required. *See Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 69 n. 10, 881 P.2d 1210, 1215 n. 10 (1994). This court can only dismiss the appeal and therefore does so.

*Id.* (original brackets omitted) (format altered). The Hui appealed the circuit court's decision to this court. *Id.* at 131, 139 P.3d at 719.

At the outset, this court set forth the applicable law, stating that:

"HRS § 91–14(a) provides the means by which judicial review of administrative contested cases can be obtained. Among its prerequisites, the section requires that a contested case must have occurred before appellate jurisdiction may be exercised." *Pele Defense Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994) (citation omitted). HRS § 91–1(5) (1993) defines a "contested case" as "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91–1(6) (1993), in turn, defines an "agency hearing" as "such hearing held by an agency immediately prior to a judicial review of a contested case as provided in section 91–14." *Thus, "[a] contested case is an agency hearing that [ (]1) is required by law and [ (]2) determines the rights, duties, or privileges of specific parties."* [*PASH* ], 79 Hawai'i at 431, 903 P.2d [at] 1252 (internal quotation marks and citation omitted) (emphasis added).

*Id.* at 132, 139 P.3d at 720 (emphasis added).

In applying the above test, the *Kaniakapupu* court explained that "the Hui's motion

---

**20.** A "hui" is defined as, *inter alia,* a "[c]lub, association, society, corporation, company, institution, organization, band, league, firm, joint ownership, partnership, union, alliance, troupe, [or] team." M. Pukui & S. Elbert, Hawaiian Dictionary 86 (rev. ed. 1986).

for an [OSC] was essentially a threshold motion or procedural vehicle to obtain a show cause hearing *in order for* the LUC to determine the rights, duties, or privileges of specific parties." *Id.* at 134, 139 P.3d at 722 (emphasis in original). Thus, the *Kaniakapupu* court held that, although the motion hearing was required by law, *i.e.*, not discretionary and mandated by HAR § 15–15–70(i), it did not determine the rights, duties, or privileges of the parties because the hearing merely addressed whether a not a contested case hearing was required regarding the Hui's motion to show cause. *Id.* at 133–34, 139 P.3d at 721–22.

The *Kaniakapupu* court, however, acknowledged the argument raised by the Hui that, "if the circuit court has no jurisdiction to determine if an appellant were entitled to a contested case hearing after having requested one, any agency could arbitrarily and capriciously deny anyone a hearing at any time, regardless of whether such hearing were required by law, and the aggrieved party could never obtain judicial review of such denial." *Id.* at 137, 139 P.3d at 725 (original brackets omitted). Nevertheless, this court held such argument was without merit, indicating that the Hui did not request a contested case hearing and emphasizing that, "[i]ndeed, the Hui concede[d] that there is no procedural vehicle for 'any party or

interested person' to obtain a contested case hearing on whether a petitioner has failed to perform according to the conditions imposed or has failed to perform according to the representations or commitments she made." *Id.* (original brackets and some internal quotation marks omitted).

Here, unlike in *Kaniakapupu*, there *is* "a procedural vehicle for 'any party or interested person' to obtain a contested case," *i.e.*, HAR § 13–300–51, and Kaleikini *did* request a contested case hearing pursuant to that rule. Indeed, it is undisputed, as discussed more fully *infra*, that Kaleikini followed the procedures set forth for requesting a contested case hearing.[21] Thus, *Kaniakapupu* is distinguishable from the instant case on that ground.[22] As such, the appropriate inquiry here is whether Kaleikini has met the requirements of HRS § 91–14. *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252 (indicating that "the necessary inquiry" was whether the appellant met the requirements of HRS § 91–14).

### 2. Contested Case Hearing

■ In *PASH*, we described the requirements of HRS § 91–14 as follows:

**first,** the proceeding that resulted in the unfavorable agency action must have been a "contested case" hearing—*i.e.*, a hearing

21. We note that, in *Hui Kakoo Aina Hoopulapula v. Board of Land and Natural Resources*, 112 Hawai'i 28, 143 P.3d 1230 (2006), this court also determined that the circuit court did not have jurisdiction over an agency appeal because, although "DLNR properly promulgated specific procedures for a contested case hearing [,] ... the [a]ppellants failed to follow the requisite procedures, [and, thus,] there was no contested case from which the Appellants could appeal, pursuant to HRS § 91–14(a)." 112 Hawai'i at 41, 143 P.3d at 1243. *See also Simpson v. Dep't of Land & Natural Res.*, 8 Haw.App. 16, 24–25, 791 P.2d 1267, 1273 (1990) (holding that a public hearing required by law is not a contested case where (1) the agency has properly promulgated specific procedures for a contested case hearing and (2) a party has failed to follow such procedures).

22. The concurrence contends that our attempt to distinguish *Kaniakapupu* is "illusory" because "HRS § 91–14(a) and the case law interpreting HRS § 91–14(a) do not make any reference to a 'procedural vehicle' as a prerequisite to a contested case hearing." Concurring op. at 41, 237

P.3d at 1107. More specifically, the concurrence argues that

HRS § 91–14(a) does not suggest that there is a different standard applied to those persons aggrieved who have brought a contested case under a "procedural vehicle" provision from those persons aggrieved who have brought a contested case in the absence of a "procedural vehicle." *See E & J Lounge [Operating Co., Inc. v. Liquor Comm'n of City and County of Honolulu ]*, 118 Hawai'i 320, 330, 189 P.3d [432,] 442 [ (2008) ]; *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252; *Puna Geothermal*, 77 Hawai'i at 67, 881 P.2d at 1213.

*Id.* at 41, 237 P.3d at 1107.

As indicated above, the "procedural vehicle" in this case is HAR § 13–300–51, and such rule provides the legal authority for aggrieved persons to request and obtain contested case hearings to appeal burial council determinations. Because the Hui in *Kaniakapupu* had *no similar authority to request or obtain a contested case hearing*, the case at bar is distinguishable from *Kaniakapupu* and such distinction is not "illusory."

that was [ (]1) "required by law" and [ (]2) determined the "rights, duties, and privileges of specific parties"; **second,** the agency's action must represent "a final decision and order," or "a preliminary ruling" such that deferral of review would deprive the claimant of adequate relief; **third,** the claimant must have followed the applicable agency rules and, therefore, have been involved "in" the contested case; and **finally,** the claimant's legal interests must have been injured—*i.e.,* the claimant must have standing to appeal.

*PASH,* 79 Hawai'i at 431, 903 P.2d at 1252 (bold emphases added). We, therefore, examine each of the *PASH* requirements.

### a. *required by law*

■ "In order for an agency hearing to be 'required by law,' it may be required by (1) agency rule, (2) statute, or (3) constitutional due process." *Kaniakapupu,* 111 Hawai'i at 132, 139 P.3d at 720. On direct appeal, Kaleikini argued that "both HRS § 6E–43(c)[, quoted supra note 6,] and constitutional rights mandated that [she] be granted her request for a contested case hearing."

■ In *Bush v. Hawaiian Homes Commission,* 76 Hawai'i 128, 870 P.2d 1272 (1994), this court stated:

If the statute or rule governing the activity in question does not *mandate* a hearing prior to the administrative agency's decision-making, *the actions of the administrative agency are not "required by law"* and do not amount to "a final decision or order in a contested case" from which a direct appeal to circuit court is possible.

76 Hawai'i at 134, 870 P.2d at 1278. In other words, "pursuant to HRS § 91–14, in order for proceedings before an agency to constitute a contested case from which an appeal can be maintained, the agency must be required by law to hold a hearing before a decision is rendered." *Lingle,* 107 Hawai'i at 184, 111 P.3d at 593.

Here, HRS § 6E–43(c), as previously quoted, provides that "determinations [by the OIBC] may be administratively appealed to a panel composed of three council chairpersons

and three members from [BLNR] as a contested case pursuant to chapter 91." In turn, HAR § 13–300–51(a), as previously quoted, states that:

When required by law, the appeals panel *shall* hold a contested case hearing *upon timely written petition* of any *person who is aggrieved* by [an OIBC] determination to preserve in place or relocate Native Hawaiian skeletal remains and any burial goods from a previously identified burial site and who is properly admitted as a party pursuant to section 13–300–54.

(Emphases added).

On direct appeal, DLNR argued that the statutory scheme did not mandate a contested case hearing because a

contested case can occur **only if the BLNR chairperson determines that one is required.** The applicable rules do not provide an "absolute right to such a hearing." *See Bush,* 76 Hawai'i at 135, 870 P.2d at 1279. In this case, [the BLNR chairperson], who had "wide administrative discretion to determine the validity of a particular claim and [was] not *required* to hold a contested case hearing[,]" [*i* ]*d.,* determined that based on factual and legal grounds a contested case was not required and denied appellant's request for one. Accordingly, a contested case could not have occurred and did not occur.

(Bold emphasis added.) (Emphasis and some brackets in original.) (Record citation omitted.) In support of its contention that a "contested case can occur only if the BLNR chairperson determines that one is required," DLNR points to HAR § 13–300–53, which states: "After a determination is made by the presiding officer [23] that a contested case hearing is required, the written notice of hearing shall be served by the [DLNR] upon the parties[.]" DLNR, relying on *Bush,* further maintains that the BLNR chairperson has "wide administrative discretion to determine the validity of a particular claim and [was] not *required* to hold a contested case hearing." *Bush,* 76 Hawai'i at 135, 870 P.2d at 1279. In our view, DLNR's reliance on *Bush* is misplaced.

---

23. HAR § 13–300–2 defines the "presiding offi-cer" as "the chairperson of the [BLNR]."

In that case, the appellants, who were native Hawaiian lessees pursuant to the Hawaiian Homes Commission Act (HHCA), took an appeal from a denial of their request for judicial review of the Hawaiian Homes Commission's (Commission) approval of third party agreements (TPAs) between non-Hawaiian farmers and native Hawaiian lessees pursuant to the HHCA. 76 Hawai'i at 131, 870 P.2d at 1275. In December 1987, some appellants appeared before the Commission to contest the validity of the TPAs as violative of the HHCA provision prohibiting transfer of the native Hawaiian lessees' interest in the land. *Id.* at 132, 870 P.2d at 1276. Upon determining that the TPAs, when properly executed, did not violate the provisions of the HHCA, the Commission caused the Department of Hawaiian Home Lands (DHHL) to notify all lessees that, if they intended to enter into a TPA, they must obtain written approval from the Commission in accordance with HAR § 10-3-35, entitled "Contracts covering lease lands." *Id.* Four days before the Commission planned to consider the written submissions of a number of lessees, the appellants, in accordance with HAR § 10-5-31, quoted *infra*, petitioned for a contested case hearing. *Id.* Ultimately, the Commission approved the TPAs submitted by the lessees and denied the appellants' request for a contested case hearing. *Id.* at 133, 870 P.2d at 1277. The appellants appealed both agency decisions to the circuit court. *Id.* Upon motion by the Commission, the circuit court dismissed the appeal based on a lack of subject matter jurisdiction. *Id.* Thereafter, the appellants timely appealed to this court. *Id.*

In determining whether a contested case was "required by law," the *Bush* court looked to the administrative regulations at issue and determined that the regulations "dictate[d] the appropriate procedure to follow in petitioning for a contested case but at the same time accord[ed] the Commission wide discretion in deciding whether to grant the petition." *Id.* at 135, 870 P.2d at 1279. Specifically, the HAR at issue—HAR §§ 10-5-31 and 10-5-32—stated in relevant part that:

§ 10-5-31 *Contested case hearing requests.* (a) Any person or agency including the commission and the department may request a contested case hearing and shall have the right and full opportunity to assert a claim provided that the claim is based on a law or rule over which the commission has jurisdiction.

. . . .

(c) Upon receipt of the complaint, the department shall initiate an investigation of the matters contained in the complaint. The complaint shall be presented within a reasonable time to the commission, together with investigator's report and staff recommendation and on the basis thereof the ***commission shall determine whether proceedings shall be initiated and the matter set for hearing.***

(d) It is the policy of the commission not to initiate proceedings where the matters complained of involve a private controversy redressable in the courts and where the public interest is not involved, or where it is clear on the face of the complaint that there has been no violation of the law or any rule of the commission.

§ 10-5-32 *Decision to hold hearing, scheduling.*

(a) The commission shall hold a contested case hearing ***whenever it finds*** that:

(1) Such a hearing is required by Chapter 91, HRS;

(2) There is reason to believe that a law or rule of the commission has been violated;

(3) Such a hearing would be in the best interest of one or more of the beneficiaries of the act; and

(4) A proceeding by the commission would be in the interest of the department.

*Id.* at 135, 870 P.2d at 1279 (italics in original) (bold emphases added). Based on the foregoing, the *Bush* court reasoned that, "[i]n both sections, the Commission is allocated the discretion to determine whether contested case proceedings should be initiated and an actual hearing held. In other words, . . . the allegedly aggrieved claimant **has a <u>conditional</u> right to a contested case hearing, dependent upon the Commission's evaluation of the matter.**" *Id.* (underscored emphasis in original) (bold emphasis added).

Thus, the *Bush* court concluded that, inasmuch as "[t]he Commission [was] granted wide administrative discretion to determine **the validity of a particular claim** and [was] not required to hold a contested case hearing . . . there [was] no **regulatory mandate** for a hearing prior to the Commission's decision on TPA petitions," and, accordingly, no hearing was "required by law." *Id.* (underscored emphasis in original) (bold emphases added).

In determining "the validity of a particular claim," the Commission was required to decide, pursuant to HAR § 10-5-32, whether it had "reason to believe that a law or rule of the [C]ommission ha[d] been violated" and that the hearing would be in the best interests of one or more of the claimants and the department. However, a similar substantive determination is not required nor contemplated by the regulations applicable to the instant case. Here, as pointed out by DLNR, HAR § 13-300-53 provides that, "[a]fter a determination is made by the [BLNR chairperson] that a contested case hearing is required, the written notice of hearing shall be served by the department upon the parties[.]" Unlike in *Bush,* there is nothing in the HARs applicable to the case at bar that indicates the criteria upon which the BLNR chairperson's determination is to be based—other than "the regulatory mandate" that a petition for a contested case hearing "shall" meet certain pleading requirements, *see* HAR § 13-300-52(b). In other words, the BLNR chairperson's determination is limited to whether the procedural requirements have been met, and, if so, HAR § 13-300-51 provides that "the appeals panel *shall* hold a contested case hearing[.]" (Emphasis added.) The lack of a regulation similar to that found in *Bush* underscores the fact that, in cases involving burial sites and human remains—as we have here,—the BLNR chairperson is not permitted to substitute his or her judgment for that of the appeals panel with regard to the substantive merits of the claimant's petition. In fact, because the chairperson's assessment is limited to whether procedural requirements have been met, the viability and/or validity of the allegations made in the petition are not at issue until properly before the appeals panel. Thus, as

stated previously, DLNR's reliance on *Bush* is misplaced.

Additionally, DLNR argues:

Section 6E-43(c), HRS, which <u>permits but does not require</u> contested cases arising from certain burial council decisions, states in relevant part that burial council determinations to preserve in place or relocate previously identified native Hawaiian burials "**may be administratively appealed** to a panel composed of three council chairpersons and three members from the board of land and natural resources** as a contested case pursuant to chapter 91."

(Underscored emphasis added.) (Bold emphasis in original.) The DLNR further argues that, "[i]t is clear from the foregoing statutory framework, as implemented by the administrative rules [ (specifically focusing on HAR § 13-300-53, quoted *supra* ) ], that a section 6E-43(c) contested case can only occur if the BLNR chairperson determines that one is required." In so arguing, the DLNR believes that the word "may" refers to the discretionary authority of the BLNR chairperson to decide whether to allow an administrative appeal as a contested case. Seemingly, the DLNR would have us believe that, if the legislature intended to mandate a hearing, it would have used the word "shall." We disagree with DLNR's reading of the statute.

First, the word "may," in our view, applies to the person aggrieved by the agency's determination and who has the discretion to decide whether to pursue an administrative appeal as a contested case in the first instance. Second, we agree with Kaleikini that "it would have been absurd for the legislature to use the word 'shall' because that would have meant that every council determination would be appealed. The language employed gave Kaleikini the right to a contested case hearing ... with all the procedural safeguards as articulated in HRS [c]hapter 91." Those "procedural safeguards" are found in HAR § 13-300-52, quoted *supra,* note 8. Third, when the request for a contested case hearing satisfies the procedural requirements of section 13-300-52, then, HAR § 13-300-51—by virtue of the use of the mandatory language

"shall"—requires that the appeals panel hold a contested case hearing. Thus, when read together—and coupled with our reading of HAR § 13–300–53, discussed *supra*,—HRS § 6E–43 and HAR § 13–300–51 confer upon an aggrieved claimant—like Kaleikini—the right to a contested case hearing as long as the written petition meets the procedural requirements of HAR § 13–300–52.

 Here, it is undisputed that Kaleikini complied with the requirements of HAR § 13–300–52, that is, her written petition was proper. As such, a contested case hearing was mandated by statute (*i.e.*, HRS § 6E–43) and agency rule (HAR § 13–300–51) and, thus, was "required by law." *Kaniakapupu*, 111 Hawai'i at 132, 139 P.3d at 720 (agency hearing required by law when mandated by statute, rule or constitutional due process).[24]

The concurrence argues that,

[a]s the majority suggests, HAR § 13–300–53 grants the chairperson the power to decide whether a contested case will be convened or not. However, *this authority exceeds the scope of HRS § 6E–43*, because [HAR] § 13–300–53 gives the chairperson authority that the plain language of HRS § 6E–43 does not grant. There is nothing in the statute that empowers the chairperson to exercise a veto over a request upon so-called procedural or any other grounds. Accordingly, the provision in HAR § 13–300–53 that affords the chairperson the power to make such decisions is "invalid and must be struck down."

Concurring op. at 33, 237 P.3d at 1099 (citing *Stop H–3 Ass'n v. State Dep't of Transp.*, 68 Haw. 154, 161, 706 P.2d 446, 451 (1985)) (emphasis added). We disagree.

Preliminarily, we observe that, although an agency hearing can be "required by law" if required by an "agency rule," *see Kaniakapupu*, 111 Hawai'i at 132, 139 P.3d at 720, a rule that "exceeds the scope" of its statutory authority is invalid and, consequently, could not legally "require" an agency hearing. Inasmuch as the concurrence attacks the validity of a DLNR agency rule, we first turn to examine the DLNR's rule-making authority.

 With respect to an agency's rule-making authority, this court has stated that:

A public administrative agency possesses only such rule-making authority as is delegated to it by the state legislature and may only exercise this power within the framework of the statute under which it is conferred. Administrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down. In other words, an administrative agency can only wield powers expressly or implicitly granted to it by statute.

*Capua v. Weyerhaeuser*, 117 Hawai'i 439, 446, 184 P.3d 191, 198 (2008) (citing *Haole v. State*, 111 Hawai'i 144, 156, 140 P.3d 377, 389 (2006)) (emphasis and brackets omitted). However, it is also well-established that "an administrative agency's authority includes those *implied powers that are reasonably necessary to carry out the powers expressly granted*. The reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out the duties and responsibilities of the agency." *Capua*, 117 Hawai'i at 446, 184 P.3d at 198 (emphasis added) (citation omitted).

 Here, the DLNR's authority to make rules related to the historic preservation of burial grounds is found in HRS § 6E–43.5 (2009), which provides in relevant part that "[t]he [DLNR], in consultation with the [burial] councils, office of Hawaiian affairs, representatives of development and large property owner interests, and appropriate Hawaiian organizations . . . *shall adopt rules pursuant to chapter 91 **necessary to carry out the purposes of this section**.*" (Emphases added). The "purposes of this section," *i.e.*, HRS chapter 6E, are set forth in HRS § 6E–1, as follows:

The Constitution of the State of Hawai'i recognizes the value of conserving and developing the historic and cultural property

24. Inasmuch as we determine that a contested case hearing was mandated by statute and agency rule, it is not necessary for us to address Kaleikini's contention that a contested case hearing was mandated by the constitution.

within the State for the public good.... The legislature further declares that *it is in the public interest to engage in a comprehensive program of historic preservation at all levels of government to promote the use and conservation of such property for the education, inspiration, pleasure, and enrichment of its citizens.* The legislature further declares that it shall be the public policy of this State to provide leadership in preserving, restoring, and maintaining history and cultural property, to ensure the administration of such historic and cultural property in a spirit of stewardship and trusteeship for future generations, and *to conduct activities, plans, and programs in a manner consistent with the preservation and enhancement of historic and cultural property.*

(Emphases added.) Accordingly, the plain language of HRS § 6E–43.5 authorizes the DLNR to promulgate rules that are: (1) in accordance with HRS chapter 91 (governing administrative procedure); and (2) necessary to implement or "carry out" the purposes of HRS chapter 6E, including "engag[ing] in a comprehensive program of historic preservation at all levels of government" and/or "promot[ing] the use and conservation" of historical and cultural property. We now examine HAR § 13–300–53 in light of the DLNR's statutory rule-making authority.

Title 13, subtitle 13, chapter 300 of the HAR, promulgated by the DLNR, sets forth the "rules of practice and procedure relating to burial sites and human remains." HAR § 13–300–53, entitled "notice of hearing," provides that,

> *[a]fter a determination is made by the presiding officer that a contested case hearing is required,* the written notice of hearing shall be served by the department upon the parties in accordance with section 91–9.5, HRS, and shall be served on all persons admitted as a party at their last recorded address not less than fifteen days prior to the beginning of the contested case hearing.

(Emphasis added.) As indicated *supra*, the BLNR chairperson's authority to determine whether a contested case hearing is required is limited to whether a party has met the procedural requirements set forth in HAR § 13–300–52. Stated differently, the chairperson, in making his or her determination, examines only whether a party has complied with procedural requirements for filing an administrative appeal from an OIBC determination. If so, then HAR § 13–300–51 mandates a contested case hearing and such hearing is, thus, "required by law."

A review of HRS chapter 91 demonstrates that HAR § 13–300–53 and our interpretation thereof do not conflict with the provisions of such chapter. Further, a contested case hearing that is "required by law" when a party complies with the procedural dictates of HAR § 13–300–52 enables parties to present the merits of their appeal. It follows that such process helps ensure that parties are able to present their claims regarding the preservation of burial grounds and other historic property in an expeditious manner, often in situations where time is of the essence, as was the case here because Kaleikini was seeking to preserve the iwi and prevent their imminent removal. As a result, HAR § 13–300–53 effectively creates an appellate system that is "consistent with the preservation and enhancement of historic and cultural property" and, thus, "carries out" the purposes of HRS chapter 6E. Consequently, it does not exceed the DLNR's rule-making authority under HRS § 6E–43.5. We now determine whether HAR § 13–300–53 "exceeds the scope" of HRS § 6E–43(c), as the concurrence contends.

■ As indicated *supra*, HRS § 6E–43(c) provides that:

> Council determinations may be administratively appealed to a panel composed of three council chairpersons and three members of the [BLNR] as a contested case pursuant to chapter 91. In addition to the six members, the chairperson of the [BLNR] shall preside over the contested case and vote only in the event of a tie.

In other words, HRS § 6E–43(c) provides for the right to administratively appeal a council determination to a panel. However, it does not set forth a specific process for initiating and conducting such an appeal. As stated above, the legislature "cannot foresee all the problems incidental to carrying out the

duties and responsibilities of the agency." As a result, agencies—such as the DLNR in this case—have the power to make rules that are "reasonably necessary" to "carry out" its duties. Based on such rule-making power, the DLNR appropriately promulgated administrative rules necessary to implement the statutory right to appeal by establishing procedural rules to initiate and conduct an administrative appeal to the OIBC, including, *inter alia,* HAR § 13–300–53.

As previously concluded, the determination of the chairperson pursuant to HAR § 13–300–53 is limited to an examination of whether a party has complied with the procedural requirements for submitting an appeal pursuant to HAR § 13–300–52. Indeed, the chairperson does not decide or even address the substantive merits of a party's appeal. As a result, HAR § 13–300–53 merely furnishes part of the process for appealing a council determination and ascertaining whether such hearing is "required by law." Further, the chairperson's determination does not: (1) abrogate or alter a litigant's substantive right to appeal as set forth in HRS § 6E–43(c); (2) deprive the panel of their authority to adjudge the merits of the appeal; or (3) otherwise displace the role and structure of the appellate panel laid out in HRS § 6E–43. Thus, HAR § 13–300–53 does not "exceed the scope of HRS § 6E–43," and, instead, "carries out" a function of the administrative appellate process, as authorized by HRS § 6E–43.5(c), quoted *supra.* Therefore, the concurrence's argument that HAR § 13–300–53 is "invalid and must be struck down" is unavailing. *See* Concurring op. at 33, 237 P.3d at 1099.

The concurrence, however, disagrees with our conclusion that HAR § 13–300–53 does not "exceed the scope of HRS § 6E–43" and, relying on *Haole v. State,* 111 Hawai'i 144, 140 P.3d 377 (2006), argues that, "[b]ecause the legislature specifically defined the role of the chairperson in HRS § 6E–43, this court, as well as the DLNR[,] must give effect to the language of the statute itself." Concurring op. at 35, 237 P.3d at 1101 (citations and internal brackets omitted).

It appears that the concurrence relies upon *Haole* to essentially assert that the role of the chairperson—as defined in HRS § 6E–43—is a limited one, and that, because no other role for the chairperson was set forth in HRS § 6E–43, the chairperson has no further authority outside of "presiding over the contested case and voting in the event of a tie." HRS § 6E–43. We disagree.

The concurrence correctly observes that the *Haole* court examined an administrative rule imposing a regulatory duty on "owners and operators conducting unloading activities on state piers" to defend and indemnify the State of Hawai'i in order to determine whether such rule was authorized by the statutes governing the Department of Transportation (DOT). *Haole,* 111 Hawai'i at 146, 140 P.3d at 379. In so doing, the *Haole* court looked to and applied the test for reviewing an agency's construction of a statute "which it administers" set forth in *Orca Bay Seafoods v. Northwest Truck Sales, Inc.,* 32 F.3d 433 (9th Cir.1994)—the first question of which is "whether Congress[, *i.e.,* the legislature,] has directly spoken to the precise question at issue." *Haole,* 111 Hawai'i at 155, 140 P.3d at 388.

Looking to the first question of the test, the *Haole* court observed that the legislature had "spoken to the issue" of State liability when it enacted the State Tort Liability Act, which provided in part that the State is generally liable for actual damages caused by the negligence of its employees "in the same manner and to the same extent as a private individual under like circumstances." *Id.* at 151, 140 P.3d at 384 (quoting HRS § 662–2 (1993)). It further observed that "[t]his court has consistently held that private parties may contract to indemnify the indemnitee for the indemnitee's own negligence but there must be a 'clear and unequivocal' assumption of liability by one party for the other party's negligence." *Id.* (citations omitted).

In examining whether the language of the DOT's governing statutes authorized the State to impose a duty of indemnification via statute (instead of contractually imposing such a duty), the *Haole* court determined that the DOT's authority was specifically defined in the governing statutes, and that such

statutes did not "explicitly state that DOT's rule-making authority includes the power to impose a duty of indemnification." *Id.* at 154, 140 P.3d at 387. With regard to the DOT's implied powers, the *Haole* court concluded that, because: (1) the DOT's authority is specifically defined by statute; (2) the legislature had spoken to the issue of State liability; and (3) the DOT could contract for the indemnity that it was attempting to impose in an administrative rule, the DOT was not "permitted to bypass the general requirement that parties (in this case, the State) seeking to shift liability to another ... must secure the clear and unequivocal agreement of that party to assume the liability of another." *Id.* at 155–56, 140 P.3d at 388–89 (citation omitted). Consequently, the *Haole* court held, in relevant part, that the statutes governing the DOT "do not explicitly or implicitly authorize the DOT to issue administrative rules exonerating the State from the negligence of its employees." *Id.* at 160, 140 P.3d at 393 (footnote omitted).

Here, HRS § 6E–43 defines the role of the chairperson, just as the DOT statutes defined the powers of the DOT. Such defined powers indicate that the chairperson does not have explicit power, pursuant to HRS § 6E–43, to examine the procedural requirements for requesting a contested case hearing—just as the DOT did not have explicit power under the statute to promulgate an administrative rule which imposed a duty to indemnify the State. However, the language of HRS § 6E–43 does *not* limit the BLNR chairperson's authority to make a procedural determination, and the legislature has not spoken to the issue such that the DLNR is precluded from using its implied powers to delegate such authority. Indeed, unlike the State Tort Liability Act in *Haole* (in which the legislature had directly spoken to the issue of State liability), there is no statute or statutory scheme that "directly speaks to" the chairperson's authority to assess whether a contested case hearing is required. Further, as previously discussed, the statutes are silent as to the proper process for initiating and conducting an administrative appeal, and, thus, do not limit the DLNR's implicit authority to promulgate rules setting forth such an appellate process. Consequently, no intent or policy of the legislature precluded the DLNR from exercising its implied powers to promulgate HAR § 13–300–53 and grant the chairperson authority to determine whether a contested case hearing is required. Accordingly, *Haole* is not only distinguishable from the instant case, but also contrary to the concurrence. We now turn to examine whether the chairperson's authority under HAR § 13–300–53 directly conflicts with the plain language of HRS § 6E–43.

The relevant language of HRS § 6E–43, *i.e.,* that "the chairperson of the [BLNR] shall preside over the contested case and vote only in the event of a tie," precludes the chairperson from making a substantive decision as to the merits of a party's contested case, except "in the event of a tie." As discussed at length *supra,* HAR § 13–300–53, when read in conjunction with other relevant administrative rules, gives the chairperson the authority to make an assessment of only the *procedural* requirements set forth in HAR § 13–300–52(a), and such assessment is entirely unrelated to the merits. Consequently, the authority granted to the chairperson in HAR § 13–300–53 does not conflict with or usurp the role of the chairperson defined in HRS § 6E–43, nor does it contradict the plain language or intent of the statute.

Based on the foregoing, we maintain that the DLNR had implicit authority to "issue administrative rules" that provide a procedure for requesting and obtaining a contested case hearing, including HAR § 13–300–53, which, in turn, permits the BLNR chairperson to make the determination whether a contested case hearing is required. Accordingly, the concurrence's argument that the role of the chairperson defined in HRS § 6E–43 "is the end of the matter" is incorrect.

We turn next to examine whether the requested contested case hearing would have determined the "rights, duties, and privileges of specific parties." *PASH,* 79 Hawai'i at 431, 903 P.2d at 1252.

b. *rights, duties, and privileges*

█ Inasmuch as no contested case hearing was held, but, as discussed above, was

required by HRS § 6E–43 and HAR § 13–300–51 the issue here is whether the hearing, had it been held, would have determined the "rights, duties, and privileges of specific parties." *Id.* In *PASH*, this court stated that, with regard to whether a hearing would determine the rights, duties, and privileges of specific parties, its "inquiry [was] properly directed at the party whose application was under consideration." *Id.* at 432, 903 P.2d at 1253. Likewise, in *Puna Geothermal*, this court stated that:

> The public hearings held by the DOH were proceedings in which PGV "sought to have the legal rights, duties or privileges of land in which it held an interest declared over the objections of other landowners and residents of" Puna. *Mahuiki v. Planning Comm'n*, 65 Haw. 506, 513, 654 P.2d 874, 879 (1982) (concluding that this characteristic is an "obvious" element of a contested case hearing); *see also Town v. Land Use Comm'n*, 55 Haw. 538, 548, 524 P.2d 84, 91 (1974) (holding that adjacent property owner has a property interest in the amendment of a district boundary). Thus, the DOH hearings were "contested case[s]" because they were "proceeding[s] in which the legal rights, duties or privileges of specific parties were required by law to be determined after an opportunity for agency hearing." HRS § 91–1(5).

77 Hawai'i at 68, 881 P.2d at 1214. Accordingly, the relevant inquiry in the instant case, as in *PASH*, is whether a contested case hearing would have determined the rights, duties, or privileges of GGP.

The concurrence claims that:

The majority decision today, coupled with the majority's decision in *Kaniakapupu*, creates different standards for determining whether an agency action is a contested case.

Thus, on one hand, if "there is a procedural vehicle for any party or interested person to obtain a contested case[,]" then *Kaniakapupu* does not apply and the analysis as set forth in the majority's opinion here rests on "whether the hearing, had it been held, would have determined the 'rights, duties, and privileges of specific

parties.'" Majority opinion at 51. If so, then the court has jurisdiction under HRS chapter 91. On the other hand, if there is no such "procedural vehicle" for obtaining a contested case, then *Kaniakapupu* applies and the court lacks jurisdiction because there was no contested case hearing, even though, *had the hearing been held*, the hearing would have determined the "rights, duties, and privileges of specific parties." *Kaniakapupu*, 111 Hawai'i at 134, 139 P.3d at 722. Consequently, the foregoing standard, even if the hearing, had it been held, would have determined the rights, duties, and privileges of specific parties, the court lacks jurisdiction pursuant to HRS chapter 91.

Concurring op. at 41–41, 237 P.3d at 1106–07 (footnotes omitted). However, the *only* support provided by the concurrence for such position is **the dissenting opinion** in *Kaniakapupu*, which is not binding on this court and, as importantly, not the law in this jurisdiction.

Turning to the relevant inquiry whether a contested case hearing in this case would have determined the rights, duties, or privileges of GGP, we observe that OIBC's approval of GGP's burial treatment plan (and DLNR's subsequent approval of such plan without a contested case hearing) implicated GGP's use of its project site because HAR § 13–300–33 (2009) prohibits the "[i]ntentional removal of human skeletal remains or burial goods from a previously identified Native Hawaiian burial site . . . until a determination to relocate is made by the council[.]" Moreover, the approval or disapproval of the burial treatment plan determined what GGP's duties were with respect to the iwi discovered on the project site. Accordingly, had a contested case hearing been held, it would have determined the rights, duties, or privileges of GGP.

The concurrence contends that:

The chairperson's review of a petition for a contested case hearing is analogous to the LUC's entertainment of the appellant's motion for order to show cause in *Kaniakapupu* in that both were "essentially threshold motions" that occurred before a contested case was conducted. Applying the majority's reasoning in *Kaniakapupu*,

the chairperson's denial of a contested case "did not constitute a contested case for the purposes of obtaining judicial review pursuant to HRS § 91–14(a)," 111 Hawai'i at 134, 139 P.3d at 722, and, hence, "the requirement in HRS § 91–14 that the order appealed from arise from a contested case hearing, had not been met[,]" *id.* at 131, 139 P.3d at 719.

Concurring op. at 41, 237 P.3d at 1107 (internal brackets omitted). Consequently, the concurrence argues that, "*[i]f* the provision in HAR § 13–300–53 regarding the chairperson's authority is valid, as the majority holds (and which I believe it is not, as indicated previously), then, pursuant to the majority in *Kaniakapupu*, the court in the instant case lacked subject matter jurisdiction under HRS chapter 91." *Id.* at 38, 237 P.3d at 1104 (emphasis in original) (footnote omitted). However, the concurrence misconstrues our characterization of the BLNR chairperson's role in the administrative appeal process and, as such, incorrectly analogizes *Kaniakapupu* to the instant case.

In *Kaniakapupu*, it was undisputed that, in order for the petitioner-Hui to obtain a contested case hearing, they had to first file an OSC motion, request a hearing on that motion, and meet their burden of proof in demonstrating that an order to show cause was required. *Kaniakapupu*, 111 Hawai'i at 127–128, 139 P.3d at 715–716. Indeed, the parties acknowledged that "only if the LUC grants a motion and issues an order to show cause would a contested case be conducted." *Id.* at 136, 139 P.3d at 724. Finally, the Hui admitted that there was no procedure for them—or any interested party—to directly request or obtain a contested case hearing in their case. *Id.* at 137, 139 P.3d at 725. Thus, the OSC motion filed by the Hui and subsequent motion hearing were the *only procedural devices* that could possibly have provided them with a contested case hearing that would determine the rights, duties, or privileges of specific parties. Consequently, the Hui's OSC motion constituted a "threshold motion," and the motion hearing provided the only "procedural vehicle" to obtain a contested case hearing.

In the instant case, however, there was a statutory and agency rule which allowed Kaleikini to directly request and obtain a contested case hearing—*i.e.,* HRS § 6E–43(c) and HAR § 13–300–51. Further, as discussed *supra* at section C.2.b, we determined that, unlike the motion hearing in *Kaniakapupu*, a contested case hearing—had it been held—would have determined the "rights, duties, or privileges of GGP."

Additionally, we determined that a party can meet the "required by law" element of HAR § 13–300–51 by complying with the procedural requirements set forth in HAR § 13–300–52, quoted *supra,* and, pursuant to HAR § 13–300–53, the BLNR chairperson is the designated officer to determine whether such procedural requirements have been met. Thus, the chairperson's determination is to ascertain whether a party seeking an appeal has met the "required by law" element of HAR § 13–300–51. Consequently, such determination by the chairperson—unlike the LUC's denial of the Hui's OSC motion in *Kaniakapupu*—does not constitute a "threshold motion" to obtain a hearing that determines the rights, duties, or privileges of specific parties. Accordingly, the instant case is clearly distinguishable from *Kaniakapupu*.

Moreover, if the chairperson's determination whether a hearing was "required by law" constitutes a "threshold motion or procedural vehicle," as the concurrence contends, then *any inquiry* as to whether a contested case hearing is "required by law" prior to holding the hearing would be a "threshold" inquiry that does not "constitute a contested case for the purposes of obtaining judicial review pursuant to HRS § 91–14(a)." Thus, under the concurrence's interpretation, a party would never have the ability to appeal the adverse determination that a hearing was *not* "required by law," and any agency could arbitrarily and capriciously deny a party a hearing without being subject to judicial review of such denial. Such a result is contrary to fundamental notions of fairness and justice and abrogates the important interest in giving parties the opportunity to appeal adverse rulings.

In sum, we are unpersuaded by the concurrence's attempt to analogize the instant case to *Kaniakapupu*. As a result, the concurrence's contention that "the court lacked subject matter jurisdiction under HRS chapter 91, pursuant to the majority opinion in *Kaniakapupu*" is wholly without merit.

### 3. Final Decision and Order

■ The second prong of the *PASH* requirements calls for an examination whether "the agency's action . . . represents 'a final decision and order,' or 'a preliminary ruling' such that deferral of review would deprive the claimant of adequate relief." *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252. Kaleikini argues that this court "has repeatedly found that the denial of a request for a contested case hearing (or to participate in one) is a sufficiently final decision for judicial review." (Citing *Puna Geothermal*, *PASH*, and *In re Hawaii Gov't Employees' Ass'n*, 63 Haw. 85, 88–89, 621 P.2d 361, 364 (1980)). We agree.

As previously stated, this court, in *PASH* held that the circuit court properly exercised jurisdiction over an agency appeal where the agency denied a request by the appellants to participate in a contested case hearing. 79 Hawai'i at 431–33, 903 P.2d at 1252–54. Here, Kaleikini requested a contested case hearing, which DLNR denied. The denial of Kaleikini's request constituted a "final decision and order" inasmuch as it ended the litigation. Accordingly, this prong of the *PASH* requirements is met.

### 4. Applicable Agency Rules

The third step requires a determination whether "the claimant . . . followed the applicable agency rules and, therefore, [was] involved 'in' the contested case[.]" *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252. Kaleikini states that she "followed all applicable agency rules." More specifically, Kaleikini asserts that,

[a]s in *PASH* and [*Puna Geothermal*], Kaleikini testified against the authorization to relocate the iwi. As in *PASH* and [*Puna Geothermal*], Kaleikini filed a written request for a contested case hearing. Kaleikini's petition was timely filed and included all the relevant information re-

quested. Kaleikini followed the rules by requesting a hearing on a contested matter in her October 12, 2006 letter[.]

As quoted *supra* note 8, HAR § 13–300–52 governs the procedures that must be followed in requesting a contested case hearing. Our review of Kaleikini's October 12, 2006 letter, reveals that she complied with HAR § 13–300–52 inasmuch as her letter contained statements regarding: (1) the legal authority by which appeal is requested, *i.e.*, HRS § 6E–43 and HAR §§ 13–300–51 and 13–300–52; (2) the council determination being appealed and the date of the determination, *i.e.*, the September 13, 2006 decision to relocate the iwi at the Ward Village Shops Project; (3) the nature of the interest that may be adversely affected by the council determination, *i.e.*, Kaleikini's rights under article XII, section 7 of the Hawai'i constitution and her rights as a cultural decedent; (4) the relevant facts and issues raised; and (5) the relief being sought. HAR § 13–300–52. Thus, Kaleikini complied with the applicable agency rules.

### 5. Standing

■ The final prong requires that the claimant's legal interests must have been injured—*i.e.*, the claimant must have standing to appeal. *PASH*, 79 Hawai'i at 431, 903 P.2d at 1252. Kaleikini argues that she has standing "as a Native Hawaiian and as a cultural descendent of the iwi."

As indicated above, Kaleikini's legal interests stem from her cultural and religious beliefs regarding the protection of the iwi. The HAR at issue here specifically provide standing to "cultural descendant[s]," such as Kaleikini. Additionally, the Hawai'i constitution—article XII, section 7—protects such rights. Throughout the instant litigation, Kaleikini has averred that her cultural and religious beliefs require her to ensure that the iwi is left undisturbed and that the OIBC's decision, allowing GGP to disinter the iwi, has caused her cultural and religious injury. As such, we believe Kaleikini has alleged sufficient facts upon which this court can determine she has standing. According-

ly, Kaleikini has also met this final prong of the requirements set forth in *PASH*.

## IV. *CONCLUSION*

Based on the foregoing, we hold that, although Kaleikini's appeal was moot, it fell within the public interest exception to the mootness doctrine. We additionally hold that a contested case hearing was (1) required by law and (2) would have determined the rights, duties, and privileges of specific parties. Further, we conclude that: (1) DLNR's denial of Kaleikini's request for a contested case hearing represented "a final decision and order"; (2) Kaleikini followed the applicable agency rules and, therefore, was involved "in" the contested case; and (3) Kaleikini's legal interests were injured—*i.e.*, she has standing to appeal. Accordingly, we hold that the circuit court erred in dismissing Kaleikini's agency appeal for a lack of subject matter jurisdiction. Consequently, we vacate the ICA's order dismissing Kaleikini's appeal for mootness and remand the case to the circuit court for further proceedings consistent with this opinion.

Concurring Opinion by ACOBA, J.

I believe that (1) this appeal is moot, but fell within the public interest exception to the mootness doctrine,[1] (2) Petitioner had the right to a contested case hearing on a decision to remove the Native Hawaiian burial remains (iwi) in this case, and (3) the circuit court of the first circuit (the court) erred when it determined that it lacked subject

matter jurisdiction over the administrative appeal. I respectfully disagree with the majority's analysis in several aspects. First, I do not concur with the majority's opinion that "a contested case hearing was mandated by statute (*i.e.*, HRS § 6E–43) and agency rule ( [Hawai'i Administrative Rules (HAR) ] § 13–300–51 [ (2009) ] )[.]" Majority opinion at 20, 237 P.3d at 1086. Instead, I would hold that Petitioner's constitutional due process right as a Native Hawaiian practicing the native and customary traditions of protecting iwi mandated that a contested case hearing be held. Second, I disagree with the majority's assertion that "the [Board of Land and Natural Resources (BLNR) ] chairperson's determination [as] ... to whether the procedural requirements have been met," *id.* at 19, 237 P.3d at 1085, determines whether " 'the appeals panel *shall* hold a contested case hearing[,]' " *id.* (emphasis in original) (quoting HAR § 13–300–51), inasmuch as I believe the allowance of such determination by the chairperson is invalid and the panel itself should determine whether to hold a hearing. Third, assuming *arguendo* that the chairperson did have the authority to determine whether a contested case hearing would be convened or not, as the majority maintains (and with which I do not agree), then *Aha Hui Malama O Kaniakapupu v. Land Use Comm'n*, 111 Hawai'i 124, 139 P.3d 712 (2006) [hereinafter "*Kaniakapupu* "], would apply, and the court would have been correct in deciding that it lacked subject matter jurisdiction inasmuch as the chairperson's deni-

---

**1.** While the claims of Petitioner/Appellant–Appellant Paulette Ka'anohiokalani Kaleikini (Petitioner) are moot in this case, I would hold that Petitioner's claim would fall into the "public interest" exception to the mootness doctrine. This court has held in *Kaho'ohanohano v. State*, 114 Hawai'i 302, 333, 162 P.3d 696, 727 (2007), that " 'when the question involved affects the public interest and an authoritative determination is desirable for the guidance of public officials, a case will not be considered moot.' " (Quoting *Slupecki v. Admin. Dir. of the Courts, State of Hawai'i*, 110 Hawai'i 407, 409 n. 4, 133 P.3d 1199, 1201 n. 4 (2006) (citations omitted).) In *Kaho'ohanohano*, this court stated that the criteria that it considers in determining the degree of public interest are "(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for the future guidance of public officers, and (3) the

likelihood of future recurrence of the question." *Id.* (citations and brackets omitted).

First, Petitioner's claim is one of public nature because "[t]he public has a vital interest in the proper disposition of the bodies of its deceased persons, which is in the nature of a scared trust for the benefit of all." 1990 Haw. Sess. Laws Act 306, § 1 at 956. Second, an authoritative determination for future guidance of public officers on this issue is important considering the confusion surrounding the issue of whether a court had jurisdiction to review the denial of a contested case hearing under Hawai'i Revised Statutes (HRS) § 6E–43 (1993). Third, the likelihood of future recurrence is high considering the probability that burial sites will likely be unearthed at future construction projects. Because I find that Petitioner's claim falls within the "public interest" exception, I reach the merits of this case.

al of Petitioner's request for a hearing in this case was analogous to the denial by the Land Use Commission (LUC) of the appellant's request for a hearing in *Kaniakapupu,* which a majority of this court upheld.

## I.

HRS § 6E–43 governs the removal of pre-historic and historic burial sites. HRS § 6E–43(a) states that, "[a]t any site, other than a known, maintained, actively used cemetery where human skeletal remains are discovered or are known to be buried and appear to be over fifty years old, *the remains and their associated burial goods shall not be moved without the department's approval.*" [2] (Emphasis added.) With regard to native Hawaiian burial sites, an "appropriate island burial council shall determine whether preservation in place or relocation of previously identified native Hawaiian burial sites is warranted," [3] and render a determination "within forty-five days of referral by the department unless otherwise extended by agreement between the landowner and the department." HRS § 6E–43(b). "Within ninety days following the final determination, a preservation or mitigation plan shall be approved by the department in consultation with any lineal descendants, the respective council, other appropriate Hawaiian organizations, and any affected property owner." [4] HRS § 6E–43(d).

2. HRS § 6E–2 (1993 & Supp. 2006) defines the term "department" as "the department of land and natural resources" (DLNR).

3. HRS § 6E–43.5 (1993 & Supp. 2006) governs the creation, appointment, composition and duties of the island burial councils.

4. HRS § 6E–2 defines the a "mitigation plan" as "a plan, approved by the department, for the care and disposition of historic properties, aviation artifacts, and burial sites or the contents thereof, that includes monitoring, protection, restoration, and interpretation plans."

5. *See Kaho'ohanohano v. Dep't of Human Servs.,* 117 Hawai'i 262, 281, 178 P.3d 538, 557 (2008) ("Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.") (Citations omitted.); *State v. Klie,* 116 Hawai'i 519, 522, 174 P.3d 358, 361 (2007) ("Where the statutory language is unambiguous, the court's sole duty is to

HRS § 6E–43(c) authorizes the appeal of council determinations. HRS § 6E–43(c) states that "[c]ouncil determinations *may* be administratively *appealed to a panel* composed of three council chairpersons and three members from the [BLNR] as a contested case *pursuant to chapter 91.*" (Emphases added.) Also, "[i]n addition to the six members, *the chairperson of the [BLNR] shall preside over the contested case and vote only in the event of a tie.*" *Id.* (emphasis added).

By the use of the term "may," HRS § 6E–43(c) on its face permits an appeal of a council's determination by way of a contested case hearing "pursuant to [HRS] [c]hapter 91." [5] There is nothing in HRS § 6E–43(c) to indicate that "may" should not be given its ordinary meaning as permissive or discretionary. I agree with Petitioner that "[i]n this context, it would have been absurd for the legislature to use the word 'shall' because that would have meant that every council determination would be appealed." Thus, HRS § 6E–43(c) permits persons aggrieved by the council's determination the opportunity to appeal by way of a contested case hearing.

## II.

It is evident that Petitioner was entitled to a contested case hearing under HRS chapter 91. Among other factors, "[a] contested case is an agency hearing that . . . is required by law[.]" *E & J Lounge Operating Co. v.*

give effect to its plain and obvious meaning." (Citing *State v. Sakamoto,* 101 Hawai'i 409, 412, 70 P.3d 635, 638 (2003) (citations omitted).)); *City & County of Honolulu v. Ing,* 100 Hawai'i 182, 189, 58 P.3d 1229, 1236 (2002) ("[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." (Citing *State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001).)). "The term 'may' is generally construed to render *optional, permissive, or discretionary* the provision in which it is embodied; this is so at least when there is nothing in the wording, sense, or policy of the provision demanding an unusual interpretation." *State v. Kahawai,* 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004) (citations omitted) (emphasis added); *cf. Black's Law Dictionary* 1068 (9th ed. 2009) (defining the term "may" as "[t]o be permitted to[,]" "[t]o be a possibility" or "[l]oosely, is required to; shall; must").

*Liquor Comn'n of City & County of Honolulu,* 118 Hawai'i 320, 330, 189 P.3d 432, 442 (2008) (quoting *Pub. Access Shoreline Hawai'i v. Hawai'i County Planning Comm'n,* 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995) [hereinafter *"PASH"*] (internal quotation marks, citation, and brackets omitted)); *Pele Def. Fund v. Puna Geothermal Venture,* 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994).[6] "In order for [an agency] hearing to be 'required by law,' it may be required by [ (1) ] agency rule, [ (2) ] statute, or [ (3) ] constitutional due process." *PASH,* 79 Hawai'i at 431, 903 P.2d at 1252 (citing *Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214); *Kaniakapupu,* 111 Hawai'i at 132, 139 P.3d at 720.

### A.

This court in *Bush v. Hawaiian Homes Commission,* 76 Hawai'i 128, 134, 870 P.2d 1272, 1278 (1994), held that

> [i]f the statute or rule governing the activity in question does not *mandate* a hearing prior to the administrative agency's decision-making, the actions of the administrative agency are not "required by law" and do not amount to "a final decision or order in a contested case" from which a direct appeal to circuit court is possible.

(Quoting *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 90, 734 P.2d 161, 167 (1987) (Emphasis in original.)); *see also Kaniakapupu,* 111 Hawai'i at 131, 139 P.3d at 719. HRS § 6E–43, the statute "governing the activity in question, d[id] not mandate a hearing." *Bush,* 76 Hawai'i at 135, 870 P.2d at 1279. HRS § 6E–43(c) provides that

"[c]ouncil determinations *may* be administratively appealed to a panel." (Emphasis added.) From the plain language of HRS § 6E–43, there is nothing to suggest that once a council determination is appealed to the panel that the panel is then required to conduct a contested case hearing pursuant to chapter 91. Therefore, on its face the statute does not "mandate a hearing prior to the agency's decision-making" and thus, a hearing is not "required by [the statute]." *Bush,* 76 Hawai'i at 134, 870 P.2d at 1278.

The administrative "rule[s] governing the activity in question" further support the conclusion that a contested case hearing is not mandated by the statute. *Id.* Subchapter 5, chapter 300, subtitle 13 of the HAR, entitled "Administrative Appeals," establishes the process for administrative appeals of burial council determinations. HAR § 13–300–51(a) states in relevant part:

> *When required by law,* the appeals panel *shall* hold a contested case hearing upon timely written petition of any person who is aggrieved by a council determination to preserve in place or relocate Native Hawaiian skeletal remains and any burial goods from a previously identified burial site and who is properly admitted as a party pursuant to section 13–300–54.[7]

(Emphases added.) The mandate that "the appeals panel shall hold a contested case hearing upon timely written petition of any person who is aggrieved" in HAR § 13–300–51 is explicitly limited by the term "when required by law[.]" HAR § 13–300–51(a). In other words, there must be direction from

---

6. HRS § 91–14 (1993 & Supp. 2009) affords aggrieved parties judicial review over a contested case whenever the requirements of § 91–14, as set forth in *PASH,* are satisfied. The four requirements are:

> [F]irst, the proceeding that resulted in the unfavorable agency action must have been a "contested case" hearing—i.e., a hearing that was 1) "required by law" and 2) determined the "rights, duties, and privileges of specific parties"; second, the agency's action must represent "a final decision and order," or "a preliminary ruling" such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved "in" the contested case;

and finally, the claimant's legal interests must have been injured—i.e., the claimant must have standing to appeal.

*PASH,* 79 Hawai'i at 431, 903 P.2d at 1252 (emphasis added). I concur with the majority that the other requirements would be met in this case.

7. HAR § 13–300–54(a) (2009) directs that four types of persons may be allowed admission as a party—the applicant, landowner, "[a]ny person who has been recognized by the department as a known lineal descendant to the Native Hawaiian skeletal remains[,]" or "[a]ny person who can show a substantial interest in the matter that is affected by the council determination, or by the outcome of the decision of the appeals panel."

other "law" that requires the appeals panel to convene a contested case hearing. Thus, HAR § 13–300–51 indicates that the rules, by themselves, do not mandate a contested case hearing unless required by other law.

### B.

Because a contested case hearing "w[as] not required by statute or agency rule[,] . . . the remaining question [becomes] whether the hearing[ was] required by constitutional due process." *Puna Geothermal,* 77 Hawai'i at 68, 881 P.2d at 1214 (citation omitted). In *Puna Geothermal,* Puna Geothermal Ventures (PGV) applied for two permits under HRS chapter 342 (1985). *Id.* at 66, 881 P.2d at 1212. "By statute and agency rule, the [Department of Health (DOH) ] ha[d] discretionary authority to hold public hearings on such applications." *Id.* (citing HRS § 342–6(c); HAR § 11–60–45(a)) (emphasis omitted). In its discretion, the DOH held two "public informational hearings" where "various individuals testified after requesting contested case hearings." *Id.* "The DOH referred these requests to the Attorney General's (AG's) office," who "determined that there was no legal mandate to grant a contested case hearing." *Id.* Accordingly, the DOH denied the contested case hearing requests and granted PGV's permit application. *Id.* On appeal to the circuit court, PGV moved to dismiss the appeal for lack of subject matter jurisdiction. The circuit court denied the motion and subsequently denied PGV's motion to reconsider. *Id.* PGV appealed to this court.

After determining that a contested case hearing was not required by statute or administrative rule, this court held that "[c]onstitutional due process protections mandate a hearing whenever the claimant seeks to protect a 'property interest,' in other words, a benefit to which the claimant is legitimately entitled." *Id.* (citations omitted). This court further stated that,

> as a matter of constitutional due process, an agency hearing is also required where

*the issuance of a permit implicating an applicant's property rights adversely affects the constitutionally protected rights of other interested persons who have followed the agency's rules governing participation in contested cases. . . . [C]f. Bush,* 76 Hawai'i at 136, 870 P.2d at 1280 (holding that the court does not have jurisdiction to hear the claims of persons aggrieved by a final agency decision involving third party agreements because the subject matter of the hearing did not concern "property interests" under the Hawaiian Homes Commission Act and the HAR).

*Id.* (some emphasis added and some in original).

In this case, the Oahu Island Burial Council (OIBC) addressed the burial treatment plan of General Growth Properties, Inc. (GGP), which sought to remove iwi discovered at the Ward Villages Shops Project. Had the OIBC denied GGP's request to remove the iwi, GGP would have been entitled to a contested case hearing, pursuant to HRS § 6E–43, inasmuch as the denial of the treatment plan would have affected GGP's property interest and use of its property.[8] Additionally, as stated in *Puna Geothermal,* "as a matter of constitutional due process, an agency hearing is also required where the *issuance* of a permit implicating an applicant's property rights *adversely affects the constitutionally protected rights of other interested persons* who have followed the agency's rules governing participation in contested cases." *Id.* (some emphasis added, some in original). Thus, under *Puna Geothermal,* Petitioner would be entitled to a contested case hearing as a matter of constitutional due process if GGP's property rights adversely affected Petitioner's constitutionally protected rights.

In this case, Petitioner's "constitutionally protected right" was the denial of her right to exercise her Native Hawaiian customary and traditional practices—specifically, to ensure that the iwi receive proper care and respect. Native Hawaiian rights are protected by article XII, section 7 of the Hawai'i

---

8. The removal of a burial site without the permission of the DLNR is subject to criminal penalties under HRS § 6E–72 (Supp. 2006) and HRS § 6E–73 (Supp. 2006), and civil and administra-tive penalties under HRS § 6E–11 (Supp. 2006). HRS § 6E–11 also creates administrative and civil punishments.

Constitution. *Pele Def. Fund v. Paty,* 73 Haw. 578, 616–21, 837 P.2d 1247, 1269–72 (1992); *PASH,* 79 Hawai'i at 434, 903 P.2d at 1256. Article XII, section 7 of the Hawai'i Constitution provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

This court has also held in *PASH,* that "those persons who are '*descendants of native Hawaiians* who inhabited the islands prior to 1778' and who assert otherwise valid customary and traditional Hawaiian rights under HRS § 1–1 are entitled to protection regardless of their blood quantum." 79 Hawai'i at 449, 903 P.2d at 1270 (citing Haw. Const., art. XII, § 7) (emphasis in original).

In light of these constitutional provisions, native Hawaiians, whose customary practices demand that the iwi remain in place, have equal rights to a contested case hearing where these practices are adversely affected. In this case, Petitioner is a native Hawaiian with more than 50% native Hawaiian ancestry. As a native Hawaiian, her customary and traditional rights were entitled to protections articulated in article XII, section 7. *Id.* The OIBC recognized that Petitioner was a "cultural descendent"[9] to the iwi that were in issue in this case. In fact, Petitioner is a direct descendant of the original Land Commission Awardee for the property upon which the Ward Village Shops project was located. Thus, a contested case hearing was mandated by constitutional due process and, consequently, "required by law."

HRS § 91–14(a) provides the means by which judicial review of contested case hearings is obtained. HRS § 91–14(a) states in relevant part:

> (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter[.]

Because Petitioner was entitled to a contested case hearing, she would be entitled to judicial review of an adverse determination from a contested case hearing. *PASH,* 79 Hawai'i at 431, 903 P.2d at 1252 (stating that HRS § 91–14 requires that "the proceeding that resulted in the unfavorable agency action must have been a 'contested case' hearing").[10]

### III.

#### A.

The majority argues that "the BLNR chairperson's determination is limited to whether the *procedural* requirements [in HAR § 13–300–52 (2009)] have been met, and, if so, HAR § 13–300–51 provides that 'the appeals panel *shall* hold a contested case hearing.'" Majority opinion at 38 (first emphasis added; second emphasis in original) (brackets omitted). Stated differently, the majority contends that "the chairperson, in making his or her determination, examines only whether a party has complied with procedural requirements for filing an administrative appeal from an OIBC determination[,]" and "[i]f so, then HAR § 13–300–51 mandates a contested case hearing ... 'required by law.'" Majority opinion at 43–44. I do not believe the chairperson may validly

---

9. A "cultural descendant" with respect to Native Hawaiian remains is "a claimant recognized by the council after establishing genealogical connections to Native Hawaiian ancestors who once resided or are buried or both, in the same ahupua'a or district in which certain Native Hawaiian skeletal remains are located or originated from." HAR § 13–300–2.

10. As the court in this case noted, HRS § 91–14 allows for alternative remedies in the event that the issue decided does not fall squarely within Chapter 91. HRS § 91–14 states that "nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law." HRS § 91–14(a). Thus, in the event that the court lacked subject matter jurisdiction over appeal of the chairperson's denial of a contested case hearing (assuming *arguendo* the validity of this provision), nothing under HRS § 91–14 would prevent Petitioner from seeking other means of relief "provided by law" such as through a declaratory judgment.

determine procedural requirements or make *any* decision as to whether a contested case hearing can be held.

The majority relies on HAR § 13–300–53 to support its conclusion that the chairperson has the power to determine whether a contested case may be convened. HAR § 13–300–53 states in relevant part:

> (a) *After a determination is made by the presiding officer* [11] *that a contested case hearing is required,* the written notice of hearing shall be served by the department upon the parties in accordance with section 91–9.5, HRS, and shall be served on all persons admitted as a party at their last recorded address not less than fifteen days prior to the beginning of the contested case hearing.

(Emphasis added.) Thus, under the majority's position, if on one hand, the chairperson, under HAR § 13–300–53, decides that all procedural requirements are met, the chairperson has no authority to deny the contested case hearing, and "the appeals panel shall hold a contested case hearing" pursuant to HAR § 13–300–51. If, on the other hand, under HAR § 13–300–53, the chairperson decides that the procedural requirements are not met, the chairperson is authorized to make the "determination" that a contested case hearing is not required. In my view this is incorrect.

The majority's interpretation of HAR §§ 13–300–51, 13–300–52, and 13–300–53 constructs a framework that lacks a basis in the rules. *See* majority opinion at 38 (stating that the "chairperson is not permitted to substitute his or her judgment for that of the appeals panel with regard to the substantive merits of the claimant's petition[ ]" but instead "is limited to whether *procedural* requirements have been met") (emphasis added); *id.* at 19, 237 P.3d at 1085 ("[T]he determination of the chairperson pursuant to HAR § 13–300–53 is limited to an examination of whether a party has complied with the *procedural* requirements for submitting an appeal pursuant to HAR § 13–300–52.") (Emphasis added.); *id.* at 19, 237 P.3d at

1085 ("[A] party can meet the 'required by law' element of HAR § 13–300–51 by complying with the *procedural* requirements set forth in HAR § 13–300–52 ... and ... the BLNR chairperson is the designated officer to determine whether such procedural requirement has been met.") (Emphasis added.).

Although the majority draws a distinction between procedural and substantive matters, on its face HAR § 13–300–51 does not establish limits on the discretion of the chairperson to procedural matters. Nor does HAR § 13–300–51 state that once procedural requirements are satisfied, that the appeals panel must hold a contested case hearing. Furthermore, HAR § 13–300–53 also makes no distinctions between procedural or substantive matters. HAR § 13–300–53 does not limit the chairperson's role to that of only determining procedural matters. Instead, HAR § 13–300–53 states generally that the chairperson makes a determinations of whether "a contested case hearing is required." In fact, there is no basis in the language of the rules for differentiating between procedural and substantive grounds. The majority's drawing of a distinction between procedural and substantive matters is thus problematic.

Indeed, there is no statute vesting the chairperson with any authority to determine whether a contested case hearing should be held or not. HRS § 6E–43(c) states that "[c]ouncil determinations may be administratively appealed to a *panel* ... as a contested case hearing pursuant to chapter 91[,]" (emphasis added) and that "[t]he chairperson ... shall preside over the contested case and vote only in the event of a tie." Under the plain language of the statute, the only authority granted to the chairperson is the authority to "preside over the contested case" and to "vote only in the event of a tie." HRS § 6E–43(c). There is nothing in HRS § 6E–43(c) that grants authority to the chairperson to decide whether a contested case hearing will be permitted or not.

---

**11.** The term "presiding officer" is defined as "the chairperson of the [BLNR]." HAR § 13– 300–2.

## B.

Because HRS § 6E–43 does not vest the chairperson with authority to make such a determination, neither can the administrative rules that implement HRS § 6E–43 invest the chairperson with such power. This court has held that "[a] public administrative agency possesses only such rule-making authority as is delegated to it by the state legislature and may only exercise this power within the framework of the statute under which it is conferred." *Stop H–3 Ass'n v. State Dep't of Transp.*, 68 Haw. 154, 161, 706 P.2d 446, 451 (1985) (citing *Pac. Gas & Elec. Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir.1981); *Rowe v. W. Virginia Dep't of Corrections*, 170 W.Va. 230, 292 S.E.2d 650, 653 (1982); *Harris v. Alcoholic Beverage Cont. Appeals Bd.*, 228 Cal.App.2d 1, 6, 39 Cal.Rptr. 192, 195 (1964); 73 C.J.S. *Public Administrative Law* § 89 (1983)). Furthermore, "[a]dministrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down." *Stop H–3 Ass'n*, 68 Haw. at 161, 706 P.2d at 451 (citations omitted); *see also Coon v. City & County of Honolulu*, 98 Hawai'i 233, 251, 47 P.3d 348, 366 (2002) ("The court shall declare the rule invalid if it finds that it violates ... statutory provisions, or exceeds the statutory authority of the agency.") (Quoting *Foytik v. Chandler*, 88 Hawai'i 307, 315, 966 P.2d 619, 627 (1998).); *Agsalud v. Blalack*, 67 Haw. 588, 591, 699 P.2d 17, 19 (1985) ("It is axiomatic that an administrative rule cannot contradict or conflict with the statute it attempts to implement."). Put another way, "an administrative agency can only wield powers expressly or implicitly granted to it by statute." *Haole v. State*, 111 Hawai'i 144, 152, 140 P.3d 377, 385 (2006) (quoting *Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 184, 86 P.3d 982, 993 (2004)).

As the majority suggests, HAR § 13–300–53 grants the chairperson the power to decide whether a contested case will be convened or not. However, this authority exceeds the scope of HRS § 6E–43, because HAR § 13–300–53 gives the chairperson authority that the plain language of HRS § 6E–43 does not grant. There is nothing in the statute that empowers the chairperson to exercise a veto over a request upon so-called procedural or any other grounds. Accordingly, the provision in HAR § 13–300–53 that affords the chairperson the power to make such decisions is "invalid and must be struck down." *Stop H–3 Ass'n*, 68 Haw. at 161, 706 P.2d at 451 (citations omitted). The majority's reliance, then, upon HAR § 13–300–53 in its assertion that "the chairperson's assessment is limited to whether the procedural requirements have been met," majority opinion at 19, 237 P.3d at 1085, in my view is wrong.

The majority asserts that HAR § 13–300–53 was within the DLNR's authority because it was included in the "implied powers that [were] reasonably necessary to carry out the powers expressly granted[ ]" under HRS §§ 6E–43 and 6E–43.5.[12] *Id.* at 19, 237 P.3d at 1085 (emphasis omitted). While "it is well established that an administrative agency's authority includes those implied powers that are reasonably necessary to carry out the powers expressly granted[,]" *Haole*, 111 Hawai'i at 152, 140 P.3d at 385 (citations and emphasis omitted), this authority is not without restrictions and does not confer on agencies the authority to create rules that contradict the plain language of the statutes.

### 1.

In *Haole*, this court was asked to decide whether a Department of Transportation (DOT) rule, HAR § 19–41–7 (2005), requiring owners and operators conducting unloading activities on state piers to defend and indemnify the State, was authorized by the DOT's governing statutes. First, reviewing the plain language of the DOT's governing statutes, *Haole* determined that "the grant of the DOT's rule-making authority to carry out its function [was] specifically defined" and "[n]owhere in the governing statutes is there a specific delegation of power to the DOT to

---

12. HRS § 6E–43.5(c) provides in part:
 (c) The [DLNR], in consultation with the councils, office of Hawaiian affairs, representatives of development and large property owner interests, and appropriate Hawaiian organizations ... shall adopt rules pursuant to chapter 91 necessary to carry out the purposes of this section.

define the duties owed by such carriers, shippers, and consignees to the State as the indemnitee." *Id.* at 153, 140 P.3d at 386 (internal quotation marks, citation, and emphasis omitted).

Next, in determining that the DOT lacked implied authority to enact HAR § 19–41–7, *Haole* reviewed *Hyatt Corp. v. Honolulu Liquor Commission*, 69 Haw. 238, 738 P.2d 1205 (1987), and *Orca Bay Seafoods v. Northwest Truck Sales, Inc.*, 32 F.3d 433 (9th Cir.1994), which it believed "represent[ed] two ends of the spectrum." 111 Hawai'i at 155, 140 P.3d at 388. On one side of the spectrum, *Haole* discussed *Hyatt*, which decided whether a Liquor Commission rule, HAR § 7–21, "prohibit[ing] liquor licensees from engaging in discriminatory practices," exceeded its rule-making authority. *Id.* at 154, 140 P.3d at 387. According to *Haole*, this court in *Hyatt* reasoned that the Liquor Commission's governing statute's " 'extremely broad grant of authority to the Liquor Commission,' coupled with 'the great weight to be accorded to the Commission's construction of the statute and strong public policy of this State against racial discrimination,' mandated the conclusion that the [Liquor] Commission did not exceed its rule making authority when it adopted HAR § 7–21." *Id.* at 155, 140 P.3d at 388 (quoting *Hyatt,* 69 Haw. at 245, 738 P.2d at 1209).

On the other side of the spectrum, *Haole* classified *Orca Bay Seafoods* as an example of where a court struck down a "regulation . . . that exempted from the Vehicle Information and Cost Savings Act, . . . transfers of trucks with gross vehicle weight ratings of more than 16,000 pounds" because "Congress had directly spoken on the subject of the regulation at issue" through the Vehicle Information and Cost Savings Act, which "required that *all vehicle transfers include true odometer readings* or a disclosure that actual mileage is unknown." *Id.* (emphasis in original). According to *Haole*, the Ninth Circuit in *Orca Bay Seafoods* determined that the regulation was invalid because "Congress had not delegated the power to create such an exemption," and that "deference to the agency's interpretation of its governing statutes was not required because . . . 'deference

only operates if there is ambiguity or silence in the statute.' " *Id.* (quoting *Orca Bay Seafoods,* 32 F.3d at 436–37 (internal citation omitted)) (format altered).

### 2.

In comparing its facts to *Hyatt* and *Orca Bay Seafoods, Haole* indicated that the "instant case . . . is distinguishable from the above cases" because (1) "unlike *Orca Bay Seafoods, the legislature has not spoken directly to whether the DOT may impose a regulatory duty to indemnify the State* [,]" *id.* (emphasis added), and (2) while "[a]dmittedly, the governing statutes grant 'all powers necessary' for the regulation and control of state harbors, [ ] *such powers are not so 'extremely broad' as those of the Liquor Commission in Hyatt* [,]" *id.* at 155–56, 140 P.3d at 388–89 (emphasis added). *Haole* further distinguished *Hyatt*, stating that in *Hyatt* "the Liquor Commission's rule-making powers were generally described . . .; whereas [in *Haole* ], . . . the *DOT's rule-making authority is specifically defined.*" *Id.* at 156, 140 P.3d at 389 (emphasis added).

### C.

### 1.

Hence, *Haole* is not "distinguishable from" or "contrary to [this] concurrence[,]" as the majority contends. Majority opinion at 23, 237 P.3d 1089. Applying the analysis set forth in *Haole*, HAR § 13–300–53 exceeded the scope of the governing statute, HRS § 6E–43. First, as the majority concedes, HRS § 6E–43 "define[d] the role of the chairperson[.]" *Id.* at 23, 237 P.3d 1089. HRS § 6E–43 specifically established the role of the chairperson in the decision making process as only "presid[ing] over the contested case and vot[ing] only in the event of a tie." HRS § 6E–43(c). Consequently, the plain language of the governing statute indicates that the chairperson was not granted the power, pursuant to HRS § 6E–43, to make any determinations other than to "preside over a contested case" and to vote "in the event of a tie." *Id.*

Second, with respect to the DLNR's implied authority, the legislature has not spoken directly to whether the chairperson had

authority to make determinations on whether the panel shall hear a contested case hearing—just as the legislature in *Haole* had "not spoken directly to whether the DOT may impose a regulatory duty to indemnify the State." *Haole*, 111 Hawai'i at 155, 140 P.3d at 388. Thus, like *Haole*, this case is distinguishable from *Orca Bay Seafoods* inasmuch as the legislature has not spoken directly to whether the chairperson has authority to make determinations on whether the panel shall hear a contested case hearing. Furthermore, like *Haole*, such power is not as "extremely broad" as that of the Liquor Commission in *Hyatt*, but instead, the chairperson's authority in the decision making process—just as the DOT's rule-making authority to carry out its function—is expressly defined. Because the legislature specifically defined the role of the chairperson in HRS § 6E–43, this court, as well as the DLNR must give effect to the language of the statute itself. *See Haole*, 111 Hawai'i at 156, 140 P.3d at 388 (recognizing that the DOT's rule-making authority was specifically defined and did not encompass the right to require that carriers indemnify the State); *Stop H–3 Ass'n*, 68 Haw. at 161, 706 P.2d at 451 ("The primary duty of the courts in interpreting statutes is to ascertain and give effect to the intention of the legislature which, in the absence of a clearly contrary expression is conclusively obtained from the language of the statute itself." (citing *Kaiama v. Aguilar*, 67 Haw. 549, 696 P.2d 839 (1985))).

### 2.

The majority disagrees with this position, arguing that "the statutes are silent as to the proper process for initiating and conducting an administrative appeal, and, thus, do not limit the DLNR's implicit authority to promulgate rules setting forth such an appellate process." Majority opinion at 49. Further, the majority argues that "unlike the State Tort Liability Act in *Haole* (in which the

legislature had directly spoken to the issue of State liability), there is no statute or statutory scheme that 'directly speaks to' the chairperson's authority to assess whether a contested case hearing is required." *Id.* These arguments are incorrect.

As noted before, "[a]dministrative rules and regulations which exceed the scope of the statutory enactment they were devised to implement are invalid and must be struck down." *Stop H–3 Ass'n*, 68 Haw. at 161, 706 P.2d at 451 (citation omitted). Here, the legislature was not silent as to the authority the chairperson has in the "appellate process" for initiating and conducting an administrative appeal, but plainly limited the chairperson's role as "presid[ing] over the contested case and vot[ing] only in the event of a tie." HRS § 6E–43(c). Applying the rule of "*expressio unius est exclusio alterius*," the express statement of the chairperson's role as "presid[ing] over the contested case" and "vot[ing] in the event of a tie" in HRS § 6E–43(c) excludes the authority to make other determinations.[13] Thus, HRS § 6E–43(c) cannot be construed reasonably as including a grant of authority beyond that expressly set out in the statute. In defining the role of the chairperson, the legislature could have easily added to the chairperson's duties, but manifestly limited such authority under HRS § 6E–43(c). Accordingly, HAR § 13–300–53, which grants the chairperson alone the authority to decide whether "a contested case hearing is required," does in fact 1) "conflict with" and "usurp the role of the chairperson defined in HRS § 6E–43," and 2) "contradict the plain language [and] intent of the statute." Majority opinion at 50.

Next, the analysis in *Haole* never required that there be "a statute or statutory scheme that 'directly speaks to'" whether the DOT may impose a regulatory duty to indemnify the State in order for an administrative rule

13. *See Willis v. Swain*, 113 Hawai'i 246, 250, 151 P.3d 727, 731 (2006) ("*Expressio unius est exclusio alterius* [-]the express mention of one thing implies the exclusion of another."); *State v. Harada*, 98 Hawai'i 18, 42, 41 P.3d 174, 198 (2002) ("[A] statute which provides for a thing to be done in a particular manner or by a prescribed person or tribunal implies that it shall not be done otherwise or by a different person or tribunal; and the maxim *expressio unius est exclusio alterius*, the express mention of one thing implies the exclusion of another, applies to such statute."); *Fought & Co. v. Steel Eng'g & Erection, Inc.*, 87 Hawai'i 37, 55, 951 P.2d 487, 505 (1998) ("the express inclusion of a provision in a statute implies the exclusion of another[.]").

to exceed the scope of the governing statute. As previously discussed, *Haole* expressly declared that *Orca Bay Seafoods* "[was] distinguishable" because "unlike *Orca Bay Seafoods*, the legislature has not spoken directly to whether the DOT may impose a regulatory duty to indemnify the State." *Haole*, 111 Hawai'i at 155, 140 P.3d at 388. Despite this determination, however, *Haole* still concluded that the DOT did not have the implied authority to promulgate HAR § 19–41–7, in part because, "the DOT's rule-making authority [wa]s specifically defined." *Id.* at 156, 140 P.3d at 389. Therefore, contrary to the majority's contention, *Haole* did *not* depend on whether the legislature had enacted a statute or statutory scheme that "directly speaks to" the issue of State liability when it determined that the DOT did not have authority, express *or implied*, to promulgate HAR 19–41–7. Thus, by requiring that there be "a statute or statutory scheme that 'directly speaks to' the chairperson's authority," the majority directly contradicts the reasoning set forth in *Haole*.

### D.

#### 1.

Finally, the majority's argument that "HAR § 13–300–53 does not 'exceed the scope of HRS § 6E–43,' and, instead, 'carries out' a function of the administrative appellate process, as authorized by HRS § 6E–43.5(c)," majority opinion at 22, 237 P.3d at 1088, is wrong. To support its assertion, the majority argues that (1) "HAR § 13–300–51 and our interpretation thereof do[es] not conflict with the provisions of [ ] chapter[ 91,]" *id.* at 21, 237 P.3d at 1087 (2) "[this] process helps ensure that parties are able to present their claims regarding the preservation of burial grounds . . . in an expeditious manner," *id.*, (3) "HAR § 13–300–53 merely furnishes part of the process for appealing a council determination and ascertaining whether such [a] hearing is 'required by law[,]' " *id.* at 22, 237 P.3d at 1088, and (4) "the chairperson's determination does not . . . abrogate or alter a litigant's substantive right to appeal[,] . . . deprive the panel of their [sic] authority to adjudge the merits of

the appeal[,] or [ ] otherwise displace the role and structure of the appellate panel laid out in HRS § 6E–43[,]" *id.* at 22, 237 P.3d at 1088.

#### 2.

First, the majority offers no evidence that the majority's "appellate system" or "process" which requires an additional step that the chairperson decide the procedural requirements *before* petitions reach the panel is "effective[ ]" or makes such process more "expeditious" than if the panel itself were to decide whether a contested case hearing was required. *Id.* at 21, 237 P.3d at 1087. Second, the majority's contention that "time is of the essence, . . . because [Petitioner] was seeking to preserve the iwi and prevent their imminent removal[,]" *id.*, is irrelevant insofar as there is nothing to suggest that the panel could not "effectively" and "expeditiously" determine whether a contested case hearing was required.

Third, the majority's conclusion is based on the invalid view that the chairperson's decision-making duties are only limited to procedural matters. As discussed *supra*, neither HAR §§ 13–300–51 nor 13–300–53 makes a distinction between procedural and substantive matters. To reiterate, HAR § 13–300–53, on its face, allows the chairperson to make "determinations" of whether "a contested case hearing is required" and its scope is not limited to procedural determinations. Thus, despite the majority's contention, in making its determination pursuant to HAR § 13–300–53, a chairperson could indeed "abrogate or alter a litigant's substantive right to appeal," "deprive the panel of their [sic] authority to adjudge the merits of the appeal[,]" and "otherwise displace the role and structure of the appellate panel laid out in HRS § 6E–43." Majority opinion at 22, 237 P.3d at 1088.

### IV.

Unlike HAR § 13–300–53, HAR § 13–300–51 does not exceed the scope of HRS § 6E–43. HAR § 13–300–51 states that "when required by law, the appeals panel shall hold a contested case hearing upon timely written petition of any person who is aggrieved[.]" The term "appeals panel" is defined in HAR § 13–300–2 as "the panel comprised of three

members from the [BLNR] and three council chairpersons that administratively adjudicates an appeal of a council determination as a contested case." This definition follows the language of HRS § 6E–43(c), which permits appeals to be taken by a "panel composed of three council chairpersons and three members from the [BLNR] as a contested case." Because HAR § 13–300–51 does not exceed the scope of the statute it implements, HAR § 13–300–51 is valid. As such, instead of concluding that the chairperson alone has the authority to determine whether a contested case hearing is required, I would hold that under HRS § 6E–43, it is the *panel* that has the authority to determine whether a contested case hearing is required.

## V.

### A.

If, as the majority indicates, HRS § 6E–43 and HAR § 13–300–53 authorized the chairperson to exercise veto power over a request upon so-called procedural grounds, then un-

der the majority's rationale in *Kaniakapupu,* the court would lack subject matter jurisdiction in the instant case, just as the court apparently decided in its reading of that decision. In *Kaniakapupu,* the majority held that although a hearing on the appellant's motion for an order to show cause (OSC) was required by law under HAR § 15–15–70(i),[14] the hearing on the motion did not determine the rights, duties, or privileges of the parties,[15] 111 Hawai'i at 133–34, 139 P.3d at 721–22, a proposition disputed by the dissent. Thus, the majority there held that the hearing "did not constitute a contested case for the purposes of obtaining judicial review pursuant to HRS § 91–14(a)." *Id.* at 134, 139 P.3d at 722. Further, the majority in *Kaniakapupu* stated that "[the petitioner's] motion for an [OSC] was *essentially a threshold motion or procedural vehicle* to obtain a show cause hearing *in order for* the LUC to determine the rights, duties, or privileges of specific parties." *Id.* (first emphasis added) (second emphasis in original). As a consequence, the majority af-

14. According to *Kaniakapupu,* HAR § 15–15–70, entitled "Motions," provided in pertinent part that "(i) [i]f a hearing is requested, the executive officer shall set a date and time for hearing on the motion." 111 Hawai'i at 127 n. 4, 139 P.3d at 715 n. 4.

15. The dissent in *Kaniakapupu* disagreed with the majority's conclusion that the hearing on the motion for an OSC was not a contested case hearing held pursuant to HRS § 91–1(5). 111 Hawai'i at 137, 139 P.3d at 725 (Acoba, J., dissenting, joined by Duffy, J.). The dissent would have held that the circuit court had subject matter jurisdiction over the appellant's appeal, and the appellant was entitled to judicial review under HRS § 91–14(a) because (1) the hearing was one required by law, (2) the legal rights of specific parties were determined after the hearing, (3) the decision of the LUC was final, and (4) the appellant was plainly a "person aggrieved." *Id.*

In particular, the dissent disagreed with the majority's view that the hearing on the motion for an OSC did not determine the rights, duties, or privileges of the parties because the hearing merely addressed whether or not a requested case hearing was required. *Id.* at 133–34, 139 P.3d at 721–22. Instead, the dissent stated that the hearing involved specific parties, the landowners and the appellant, and that the appellant "as a party with an interest in adjoining land, had a right to have its claim that it was adversely affected determined in a contested case hearing." *Id.* at 137–38, 139 P.3d at 725–26.

At the hearing, the appellant argued that the landowners had not complied with the LUC's conditions and presented photos and a map of the area, and the landowners in response argued that they had complied with the conditions. *Id.* at 138, 139 P.3d at 726. Furthermore, following the hearing, the LUC filed a final decision and order concluding that "having considered [the motion, the LUC] concludes that [the appellant] has not met its burden in showing there has been a failure to perform a condition, representation, or commitment on the part of [the landowner]." *Id.* at 140, 139 P.3d at 728 (emphasis omitted). The dissent stated that,

[h]ence, in line with HRS § 91–1(5), the proceeding involved *"specific parties,"* here, *[the landowner] and [the appellant].* In determining that the motion should be denied, the *LUC decided the "legal rights,"* HRS § 91–1(5), *of these parties.* As required by HRS § 91–1(5), *"these rights" were "determined after an opportunity for agency hearing."* [The appellant] plainly was "aggrieved," HRS § 91–14(a), by this ruling. *See Life of the Land v. Land Use Comm'n,* 61 Haw. 3, 8–9, 594 P.2d 1079, 1082–83 (1979) (recognizing that persons living near property sought to be reclassified and those with "personal" and "special" "aesthetic and environmental interests" are "person[s] aggrieved" pursuant to HRS § 91–14(a)).

*Id.* (Acoba, J., dissenting, joined by Duffy, J.) (emphases added).

firmed the circuit court's determination that "the requirement in [HRS] § 91–14 that the order appealed from arise from a contested case hearing, has not been met[,]" and decided, "[a]s such, this court lacks jurisdiction to reach the issue of whether a contested case hearing was required." *Id.* at 131, 139 P.3d at 719.

In the instant case, the chairperson's authority to determine whether to accept a case as a contested case under the plain language of HAR § 13–300–53 fits squarely within the rubric of the majority opinion in *Kaniakapupu.* Under the majority's opinion in the instant case, upon request for a contested case hearing, the chairperson is authorized to make a "preliminary" determination of whether a contested case hearing is required, pursuant to HAR § 13–300–53, similar to the LUC's determination on the OSC motion in *Kaniakapupu.* According to the majority, in making this preliminary determination, the chairperson examines whether all the procedural requirements are met. If the procedural requirements are not met, it appears that the majority would permit the chairperson to deny the request, as the LUC could likewise reject the show cause motion.

The chairperson's review of a petition for a contested case hearing is analogous to the LUC's entertainment of the appellant's motion for an OSC in *Kaniakapupu* in that both were "essentially [ ] threshold motion[s]" that occurred before a contested case was conducted. Applying the majority's reasoning in *Kaniakapupu,* the chairperson's denial of a contested case request "did not constitute a contested case for the purposes of obtaining judicial review pursuant to HRS § 91–14(a)," 111 Hawai'i at 134, 139 P.3d at 722, and, hence, "the requirement in [HRS] § 91–14 that the order appealed from arise from a contested case hearing, ha[d] not been met[,]" *id.* at 131, 139 P.3d at 719. *If* the provision in HAR § 13–300–53 regarding the chairperson's authority is valid, as the majority holds (and which I believe it is not, as

indicated previously), then pursuant to the majority opinion in *Kaniakapupu,*[16] the court in the instant case lacked subject matter jurisdiction under HRS chapter 91.

### B.

The majority disagrees with the foregoing, arguing that (1) "unlike the motion hearing in *Kaniakapupu,* a contested case hearing— had it been held—would have determined the 'rights, duties, or privileges of GGP[,]'" majority opinion at 25, 237 P.3d at 1091, and (2) "under the concurrence's interpretation, a party would never have the ability to appeal the adverse determination that a hearing was *not* 'required by law,' and any agency could arbitrarily and capriciously deny a party a hearing without being subject to judicial review of such a denial[,]" *id.* at 25, 237 P.3d at 1091.

With respect to the first issue, the majority's statement that "unlike the motion hearing in *Kaniakapupu,* a contested case hearing—had it been held—would have determined the 'rights, duties, or privileges of GGP[,]'" *id.* at 25, 237 P.3d at 1091, in my view, is an incorrect rendition of the majority's opinion in *Kaniakapupu.* In *Kaniakapupu* the appellant argued that "its motion for an [OSC] should have been granted, and, thus, a contested case hearing should have been held thereon." 111 Hawai'i at 135, 139 P.3d at 723. In response, the majority in *Kaniakapupu* stated that "[s]uch a request ... is unattainable *due to a lack of subject matter jurisdiction* " because the "*hearing was not a contested case hearing for the purpose of obtaining judicial review* [.]" *Id.* at 136, 139 P.3d at 724 (internal quotation marks and citation omitted) (emphases added). Thus, the majority determined that the court lacked subject matter jurisdiction over the case, even though, had the LUC decided in favor of the appellant on the show cause motion, a contested case hearing would have been held thereon.

---

**16.** At the February 22, 2007 hearing on a motion to stay the agency appeal, the court read *Kaniakapupu* the same way and concluded, in part, "And so my best read of the case law, both before and *after [Kaniakapupu ], is that if there were no contested case hearing you don't get to*

*take an appeal from the decision, preliminary or otherwise."* (Emphasis added.) It should also be noted that the circuit court judge whose order dismissing the appeal for lack of jurisdiction, upheld by the majority in *Kaniakapupu,* is the same judge in the instant case.

Similarly here, Petitioner argues that had the chairperson decided in her favor, a contested hearing would have been held. Consequently, applying *Kaniakapupu* to the instant case, the court lacked jurisdiction because the chairperson had denied Petitioner's request for a contested case hearing. Contrastingly, the *Kaniakapupu* dissent determined that "the legal rights of [ ] specific parties were determined after the opportunity for an agency hearing" because the appellant's hearing on the motion to show cause in *Kaniakapupu* did in fact ultimately determine "rights, duties, or privileges[,]" and therefore the LUC's denial was subject to judicial review. 111 Hawai'i at 138, 139 P.3d at 726 (Acoba, J., dissenting, joined by Duffy, J.); *see supra* note 15.

With respect to the majority's second argument, the majority's attribution to this concurrence that "a party would never have the ability to appeal the adverse determination that a hearing was *not* 'required by law,' and any agency could arbitrarily and capaciously deny a party a hearing without being subject to judicial review of such denial[,]" majority opinion at 25, 237 P.3d at 1091, is erroneous because that was the effect of the *majority's* ruling in *Kaniakapupu* and precisely the dissent's disagreement with the majority in *Kaniakapupu*. The result of the majority's analysis in *Kaniakapupu* was "to make [the LUC's denial of its OSC motion] unreviewable, contrary to the 'entitlement' to

judicial review guaranteed under HRS § 91–14." *Kaniakapupu*, 111 Hawai'i at 142, 139 P.3d at 730 (brackets omitted). Under the majority's decision in *Kaniakapupu*, the appellant did not have the ability to appeal the LUC's adverse decision that a contested case hearing was not required, and consequently, the agency was permitted to deny a party a hearing *without being subject to judicial review of such a denial.*

The dissent in *Kaniakapupu* clearly objected to this anomalous approach, asserting that "if the LUC had granted the motion, a subsequent contested case hearing would have been held and this court would then have jurisdiction to HRS § 91–14(a)" and "under the majority's rationale, if the LUC had granted the motion, *its ultimate decision would be subject to this court's review, but since it denied the motion, its decision is unreviewable.*" 111 Hawai'i at 142–43, 139 P.3d at 730–31 (Acoba J., dissenting, joined by Duffy, J.) (emphasis added). Therefore, the dissent argued that "the fallacy of the majority's position is that the outcome of the present case is the same as it would have been had a contested case hearing been held and [the appellant] not prevailed." *Id.* at 143, 139 P.3d at 731.

With all due respect, then, I believe the majority's decision in *Kaniakapupu* was not good policy or a correct statement of law then, and it is not good policy or a correct statement of the law now.[17] Inasmuch as

---

17. The majority faults this concurrence for referring to the dissenting opinion in *Kaniakapupu* for support because it is "not binding" and "not the law in this jurisdiction." Majority opinion at 24, 237 P.3d at 1090. However, it is self-evident that judges are permitted to adhere to a position set forth in a previous concurring or dissenting opinion. *See, e.g., United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (Blackmun, J., concurring) (stating that "[m]y dissents in prior cases have indicated my continuing dissatisfaction and discomfort with the Court's vacillation" with regard to the Court's jurisprudence on vehicle searches); *Cioffi v. United States*, 419 U.S. 917, 918 n. 2, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974) (Douglas, J., dissenting, joined by Brennan, J.) ("In my dissent from *Osborn[ v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966),] and elsewhere, I have set forth my view that even prior judicial approval cannot validate intrusions into constitutionally protected zones of privacy for the seizure

of mere evidentiary material[.]") (Citation omitted.); *cf. State v. Fitzwater*, 122 Hawai'i 354, 374, 227 P.3d 520, 540 (2010) (quoting Justice Thomas's concurring opinion in *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), which stated in part, that "I continue to adhere to my position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[ ]' ").

Second, positions contained in a concurring or dissenting opinion, which are not "the law" or "binding[,]" majority opinion at 52, do not necessarily remain so. *Compare State v. Maugaotega*, 115 Hawai'i 432, 446–47, 168 P.3d 562, 576–77 (2007) (following remand from the United States Supreme Court, this court said "[i]nasmuch as [ ] HRS § 706–662 ... authorizes the sentencing court to extend a defendant's sentence beyond the 'standard term' authorized solely by the jury's verdict ... [,] the statute is

*Kaniakapupu* is precedent established by this court, the court cannot be faulted for concluding, as it apparently and correctly did in applying the majority's reasoning in *Kaniakapupu*, that it did not have subject matter jurisdiction under HRS chapter 91.[18]

## C.

In an attempt to distinguish *Kaniakapupu* from this case, the majority states that, "unlike in *Kaniakapupu*, there is 'a procedural vehicle for "any party or interested person" to obtain a contested case,' *i.e.,* HAR § 13–300–51, and [Petitioner] did request a contested case hearing pursuant to that rule." Majority opinion at 16, 237 P.3d at 1082 (emphases omitted); *see also id.* at 16 n. 22, 237 P.3d at 1082 n. 22; *id.* at 22–23, 237 P.3d

unconstitutional on its face") (footnote omitted), *and Cunningham v. California,* 549 U.S. 270, 281, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007) ("This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge[.]"), *with State v. Maugaotega,* 107 Hawai'i 399, 411, 114 P.3d 905, 917 (2005) (Acoba, J., dissenting, joined by Duffy, J.) (stating that "[b]ased on the dissent in [*State v. Rivera,* 106 Hawai'i 146, 102 P.3d 1044 (2004),] I would vacate the extended terms of imprisonment and remand for resentencing"), *vacated and remanded by Maugaotega v. Hawaii,* 549 U.S. 1191, 127 S.Ct. 1210, 167 L.Ed.2d 37 (2007), *and Rivera,* 106 Hawai'i at 166, 167, 102 P.3d at 1064, 1065 (Acoba, J., dissenting, joined by Duffy, J.) (stating that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury," and thus, "the State's sentencing procedure [in HRS § 706–662] did not comply with the Sixth Amendment") (internal quotation marks, citations, and brackets omitted).

Third, Chief Justice Hughes's statement is relevant:

When unanimity can be obtained without sacrifice of conviction, it strongly commends the decision to public confidence. But unanimity which is merely formal, which is recorded at the expense of strong, conflicting views, is not desirable in a court of last resort, whatever may be the effect upon public opinion at the time [the case is decided]. This is so because what must ultimately sustain the court in public confidence is the character and independence of the judges. *They are not there simply to decide cases, but to decide them as they think they should be decided, and while it may be regrettable that they cannot always agree, it is better that their independence should be maintained and recognized than that unanimity should be secured through its sacrifice.*

at 1088–89[19] The majority's attempt to distinguish *Kaniakapupu* is illusory for at least three reasons.

First, the majority's attempt to differentiate *Kaniakapupu* is illusory because it suggests that there is a different standard applied to those persons aggrieved who seek a contested case hearing under a "procedural vehicle" provision from those persons aggrieved who seek a contested case hearing in the absence of a "procedural vehicle." The majority's decision today, coupled with the majority's decision in *Kaniakapupu*, creates different standards for determining whether an agency action is a contested case.

Thus, on one hand, if "there is a procedural vehicle for any party or interested person to obtain a contested case[,]" majority opinion at 24, 237 P.3d at 1090 (internal quotation

William J. Brennan, Jr., *In Defense of Dissents,* 37 Hastings L.J. 427, 434 (1986) (quoting C. Hughes, *The Supreme Court of the United States,* 67–68 (1928)) (emphasis added). With all due respect, insofar as this concurrence is consistent with the dissent in *Kaniakapupu,* I maintain the position of the dissent taken there.

18. In the February 22, 2007 hearing on a motion to stay the agency appeal, the court similarly determined, based on its reading of *Kaniakapupu,* that it did not have jurisdiction over the agency appeal. In arriving at this conclusion the court stated in part that:

Because, as I have read [*Kaniakapupu*], the 2006 decision, affirming [the court's] decision *that I lack subject matter jurisdiction because there was no contested case hearing decision appealed from,* it's clear that while [Petitioner is] appealing the decision not to give a contested case, obviously there hasn't been one.

19. Similarly, the concurring opinion by Justice Recktenwald reiterates that "this court [in *Kaniakapupu*] recognized that there was no 'procedural vehicle' for the [appellant] to obtain a contested case hearing on its motion for an [OSC]." Concurring opinion at 43, 237 P.3d at 1109 (quoting *Kaniakapupu,* 111 Hawai'i at 137, 139 P.3d at 725). For the reasons set forth *infra,* the emphasis on a "procedural vehicle" by both the majority and that concurrence, in my view, erroneously creates a "procedural vehicle" requirement where HRS chapter 91 does not require one. HRS chapter 91 makes no reference to a "procedural vehicle" and the majority and that concurrence fail to point to any part of this chapter that would lend itself to such a "procedural vehicle" distinction. Furthermore, even if such a "procedural vehicle" was required, under the majority's approach in this case, HAR § 15–15–70 plainly would be the "procedural vehicle"

marks omitted), then *Kaniakapupu* does not apply and the analysis as set forth in the majority's opinion here rests on "whether the hearing, had it been held, would have determined the 'rights, duties, and privileges of specific parties[,]'" *id.* at 40–41, 237 P.3d at 1106–07. If so, then the court has jurisdiction under HRS chapter 91. On the other hand, if there is no such "procedural vehicle" for obtaining a contested case, then *Kaniakapupu* applies[20] and the court lacks jurisdiction because there was no contested case hearing, even though, *had the hearing been held,* the hearing would have determined the "rights, duties, and privileges of specific parties." *Kaniakapupu,* 111 Hawai'i at 134, 139 P.3d at 722. Consequently, under the majority's foregoing standard, even if the hearing, had it been held, would have determined the rights, duties, and privileges of specific parties, the court lacks jurisdiction pursuant to HRS chapter 91.[21] What the majority does not accept is the clear import of the majority view of *Kaniakapupu,* which the court correctly ascertained and attempted to follow.

Contrary to the majority's position, HRS § 91–14(a) does not make any reference to a "procedural vehicle" as a prerequisite to a contested case hearing. HRS § 91–14(a) states in pertinent part that "*[a]ny person aggrieved* by a final decision and order in a contested case *or by a preliminary ruling* of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief *is entitled to judicial review* thereof under this chapter[.]" (Emphases added.) HRS § 91–14(a) does not suggest that there is a different standard applied to those persons aggrieved who have brought a contested case under a "procedural vehicle" provision from those persons aggrieved who have brought a contested case in the absence of a "procedural vehicle." *See E & J Lounge,* 118 Hawai'i at 330, 189 P.3d at 442; *PASH,* 79 Hawai'i at 431, 903 P.2d at 1252; *Puna Geothermal,* 77 Hawai'i at 67, 881 P.2d at 1213. HRS § 91–14 makes no reference to such a procedural vehicle distinction, and the majority fails to provide any factual or legal support for such a contention.

Second, the majority's emphasis on the fact that in *Kaniakapupu* the administrative rule allowed parties to file a motion for an OSC, whereas the administrative rule here allows aggrieved parties to request a contested case hearing, majority opinion at 22–23, 237 P.3d at 1188–89, is a distinction without a difference. In *Kaniakapupu,* HAR § 15–15–93 allowed interested persons to file a motion for an OSC for failure to perform a condition. This court recognized that a hearing on the motion was required under HAR § 15–15–70 and that "the LUC d[id] *not* have any discretion to determine whether to hold a hearing once a hearing [was] requested[.]" 111 Hawai'i at 133, 139 P.3d at 721. Thus, contrary to the majority's assertions, HAR § 15–15–70 was a "procedural vehicle" by which an "interested party" *could* obtain a contested case hearing.[22]

to obtain a contested case hearing in *Kaniakapupu.*

20. In *Kaniakapupu,* whether the appellant was required to show that the hearing was one "required by law" was never at issue. Both the majority, 111 Hawai'i at 132, 139 P.3d at 720, and the dissent, *id.* at 124, 137, 139 P.3d at 725 (Acoba J., dissenting, joined by Duffy, J.), decided that the hearing on the motion for an OSC was one "required by law" and went on to address whether the hearing ultimately determined the rights, duties, and privileges of specific parties. Thus, to make clear, a petitioner would need to show that the subject agency hearing was one required by law.

21. The majority quotes a portion of this paragraph and then accuses this concurrence of offering no support for this position except "the dissenting opinion in *Kaniakapupu*" which the majority states is "not binding on this court and, as importantly, not the law in this jurisdiction." Majority opinion at 24, 237 P.3d at 1090. However, this concurrence cites to the *majority opinion in Kaniakapupu* which indicates that the majority in *Kaniakapupu* clearly recognized that had the show cause hearing been held in that case, the hearing would have determined the rights, duties and privileges of specific parties. *See Kaniakapupu,* 111 Hawai'i at 134, 139 P.3d at 722. Thus, despite the majority's contention, majority opinion at 22, 237 P.3d at 1088, the support provided by this concurrence for this position is the *majority opinion in Kaniakapupu.*

22. In similar vein, the concurring opinion of Justice Recktenwald argues that the court "erroneously applied *Kaniakapupu*" because unlike in the instant case, (1) "the relevant administrative rules [in *Kaniakapupu*] required that a hearing be held on the [appellant]'s motion for an [OSC], but the hearing did not constitute a contested case hearing[,]" concurring opinion at 43, 237 P.3d at 1109 (citing *Kaniakapupu,* 111 Hawai'i at

Similarly, in the instant case, HAR § 13–300–53 states that notice of a hearing be served to parties *"[a]fter* a determination is made by the [chairperson] that a contested case hearing is required[.]" (Emphasis added.) Under the majority's interpretation of HAR § 13–300–53, before a hearing is conducted, the chairperson must "examine[ ] only whether a party has complied with procedural requirements" and then "mak[es] his or her determination" of whether a contested case hearing is required.[23] Majority opinion at 21, 237 P.3d at 1087. Under the majority's view, then, the chairperson must differentiate between substantive and procedural matters and can deny a hearing based on

procedural grounds. Thus, contrary to the majority's position, the chairperson's determination is analogous to a " 'threshold motion' to obtain a hearing that determines the rights, duties, or privileges of specific parties[,]" *id.* at 25, 237 P.3d at 1091 inasmuch as such a determination must be made before a contested case hearing can be held.

Third, as *PASH* indicates, an agency hearing is "required by law" if required by "statute, agency rule, or constitutional due process." 79 Hawai'i at 431, 903 P.2d at 1252 (citing *Puna Geothermal,* 77 Hawai'i at 67–68, 881 P.2d at 1213–14). It is not necessary that the aggrieved party also demonstrate that there was an additional "procedural vehicle" that allowed the aggrieved party to

132–34, 139 P.3d at 720–22); (2) "there was no 'procedural vehicle' for the [appellant] to obtain a contested case hearing[,]" *id.* (citing *Kaniakapupu,* 111 Hawai'i at 137, 139 P.3d at 725) and "[t]hus, a contested case was not 'required by law' [in *Kaniakapupu,*]" *id.* However, under the majority's rationale in the instant case, the OSC motion in *Kaniakapupu* was a procedural vehicle to obtain an OSC hearing. Whether any hearing constitutes a contested case is a conclusion reached when a court determines that a proceeding is one "in which legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for an agency hearing." HRS § 91–1(5).

As both the *Kaniakapupu* majority and dissent agreed, the hearing on the motion for an OSC was mandatory under HAR § 15–15–70 and "required by law." Furthermore, as the dissent stated, the record indicated the hearing ultimately "determined the 'legal rights ... of specific parties' " and, thus, was a contested case hearing subject to judicial review. *Kaniakapupu,* 111 Hawai'i at 137, 139 P.3d at 725 (Acoba, J., dissenting, joined by Duffy, J.). Of course, "it must be the substance of the agency proceeding, not its form, that controls. The controlling principle is not the label accorded the motion or proceeding, but the effect of the agency's decision." *Id.* at 143, 139 P.3d at 731. Hence, applying the majority's view in the instant case, there was "a procedural vehicle" for the contested case hearing. Justice Recktenwald's concurrence that "a contested case hearing was not 'required by law [in *Kaniakapupu,*]" concurring opinion at 27, 237 P.3d at 1093 (citing *Kaniakapupu,* 111 Hawai'i at 137, 139 P.3d at 725), would preclude judicial review of the LUC's denial of a contested case hearing in the absence of a "procedural vehicle."

23. Justice Recktenwald's concurring opinion appears to adopt the majority's position, stating, "as set forth by the majority opinion, the relevant Hawai'i Administrative Rules and statutes provide for such a hearing in the instant context." Concurring opinion at 43, 237 P.3d at 1109 (cit-

ing majority opinion at 17–18, 237 P.3d at 1083–84). With all due respect, this is incorrect. As discussed *supra,* the relevant statute, HRS § 6E–43, provides that council determinations *may* be appealed to a panel and, therefore, does not mandate that a hearing be conducted pursuant to HRS chapter 91. Moreover, HAR § 13–300–51 does not mandate a contested case hearing because the rule is explicitly limited by the term "when required by law," and thus, there must be direction from other "law" that requires the panel to convene a contested case hearing. Furthermore, in my view, HAR § 13–300–53 exceeds the scope of HRS § 6E–43, and even if it is held to be valid (as the majority believes it to be), HAR § 13–300–53 does not mandate that a contested case hearing be held inasmuch as HAR § 13–300–53 provides that the chairperson must first determine that a contested case hearing is required. Hence under HAR § 13–300–53, as viewed by the majority, the chairperson has discretion in determining whether Petitioner was entitled to a contested case hearing before the panel, and therefore, the contested case hearing is not mandated by HAR § 13–300–53.

It follows then that the denial of Petitioner's request for a hearing in the instant case is analogous to the denial of the petitioners' motion to show cause in *Kaniakapupu* because review by the chairperson, like the OSC in *Kaniakapupu,* is viewed by the majority as preliminary and determinative of the right to a contested case hearing. Therefore, under the majority's analysis in *Kaniakapupu,* the chairperson's denial of Petitioner's request, like the LUC's denial in *Kaniakapupu,* would not be subject to judicial review. For these reasons, in my view, Justice Recktenwald's statement that, "as set forth by the majority opinion, the relevant Hawai'i Administrative Rules and statutes provide for such a hearing in the instant context[,]" concurring opinion at 43, 237 P.3d at 1109 (citing majority opinion at 17–18, 237 P.3d at 1083–84), is wrong, and that concurrence is incorrect in asserting that the court "erroneously applied *Kaniakapupu* [,]" *id.*

obtain a contested case hearing. For example, in this case, as discussed *supra*, Petitioner's hearing was "required by law" under Petitioner's constitutional due process right as a Native Hawaiian practicing the native and customary traditions of protecting iwi. As a result, Petitioner was entitled to a contested case hearing, regardless of whether HAR § 13–300–51 did or did not provide Petitioner with a "procedural vehicle" to obtain a contested case hearing. Petitioner was already entitled to a contested case hearing because it was "required by law" under constitutional due process. Therefore, whether an administrative rule contains a "procedural vehicle" that would allow Petitioner a contested case hearing is wholly irrelevant in this case to whether judicial review would be available to examine a ruling adverse to Petitioner.

RECKTENWALD, J., concurring in the result.

I concur in the result reached by the majority. The circuit court, in dismissing the petition filed by petitioner/appellant-appellant Paulette Ka'anohiokalani Kaleikini (Kaleikini), stated that *Kaniakapupu v. Land Use Commission*, 111 Hawai'i 124, 139 P.3d 712 (2006) required it to rule that it lacked jurisdiction under HRS chapter 91. I write separately to emphasize my view that the circuit court erroneously applied *Kaniakapupu* and therefore erred in dismissing Kaleikini's petition. In *Kaniakapupu*, the relevant administrative rules required that a hearing be held on the plaintiff's motion for an order to show cause, but the hearing did not constitute a contested case hearing. *Id.* at 132–34, 139 P.3d at 720–22. Additionally, this court recognized that there was no "procedural vehicle" for the plaintiff to obtain a contested case hearing on its motion for an order to show cause. *Id.* at 137, 139 P.3d at 725. Thus a contested case hearing was not "required by law." *Id.* In contrast, as set forth by the majority opinion, the relevant Hawai'i Administrative Rules and statutes provide for a contested case hearing in the instant context. Majority op. at 17–18, 237 P.3d at 1083–84. Finally, I believe that it is appropriate to consider this case under the public interest exception to the mootness doctrine in order to clarify the scope of the holding in *Kaniakapupu.* Accordingly, I concur in the result.